United States Court of Appeals,

Eleventh Circuit.

No. 96-6753.

UNITED STATES of America, Plaintiff-Appellee,

v.

Eules MAYES, a.k.a. Tiger, etc.;  Willie Harris, a.k.a. Will Low, et al., Defendants-Appellants.

Oct. 29, 1998.

Appeals from the United States District Court for the Northern District of Alabama. (No. 97-5-74-NE), William M. Acker, Jr., Judge.

Before HATCHETT, Chief Judge, and DUBINA and CARNES, Circuit Judges.

HATCHETT, Chief Judge:

On October 19, 1995, a prison riot occurred at the Federal Correctional Institution at Talladega, Alabama (FCI Talladega).  The appellants are all former FCI Talladega inmates who were prosecuted for their involvement in the riot, and who now challenge their convictions and sentences on several grounds.[1]  We find only two issues worthy of discussion:  (1) the double jeopardy implications of prison disciplinary sanctions;  and (2) whether the appellants were denied a fair trial as a result of being required to appear in court wearing leg irons.  We affirm.

I. BACKGROUND

The October 1995 riot at FCI Talladega began in the early evening hours and involved 200 to 300 inmates.  The riot lasted for more than two hours, and the inmates broke windows, set fires and assaulted corrections officers.  Prison authorities ultimately regained control of the facility after

---

[1]The appellants in this action are Roderick Baker, Wilson Bryant, Jr., Marcus Byrd, Leon Calhoun, Torino Fultz, Brian Garrett, Willie Harris, Eules Mayes, Carlos Mimmis, Vernon Moore, Marcus Nelson and Rahman Nururdin.

using tear gas and firing warning shots into the air. Overall, the rioters caused an estimated $3,000,000 in property damage.

Following the riot, FCI Talladega authorities conducted a large-scale investigation. Over the course of about three weeks, corrections officers interviewed nearly 150 inmates and staff members. As a result of the information obtained during the investigation, corrections officers identified several inmates involved in the disturbance. The Bureau of Prisons subsequently initiated disciplinary proceedings against many of these individuals, including some of the appellants, charging them with various violations of institutional rules and regulations. Most of the appellants generally allege that, after a hearing, they were each found to have committed particular infractions and subjected to some combination of the following sanctions: (1) disciplinary transfers to maximum security prisons; (2) disciplinary segregation for 60 days; (3) disallowance of between 41 and 94 days of accrued good conduct time; (4) temporary losses of telephone, commissary, and/or recreational privileges; and (5) losses of visitation privileges for up to one year.

On February 29, 1996, a federal grand jury in the Northern District of Alabama returned a superseding indictment charging the appellants, as well as four codefendants who are not parties to

this appeal, with various offenses in relation to their involvement in the riot.[2]  The appellants

pleaded not guilty and discovery proceeded.

All of the appellants moved the district court to dismiss the indictment on double jeopardy

grounds, arguing that the prior prison disciplinary sanctions precluded the subsequent criminal

prosecutions for the same conduct.[3]  In a report and recommendation dated April 23, 1996, a

magistrate judge concluded that the motions to dismiss should be denied.  On May 1, 1996, the

district court entered an order overruling the appellants' objections to the report and recommendation

and denying the motions to dismiss.

The district court held two hearings in order to determine the appropriate security measures

to be taken at the appellants' trial.  Over defense counsel's objections, the court determined that the

appellants should be physically restrained for the duration of the trial.  In reaching this conclusion,

the court accepted the recommendation of the United States Marshals Service, whose representatives

---

[2]Count One of the indictment charged all of the appellants with willfully instigating, conspiring and assisting to cause a riot, in violation of 18 U.S.C. § 1792.  Count Two of the indictment charged Bryant, Byrd, Calhoun, Fultz, Harris, Mayes, Nelson, and Nururdin with possessing a prohibited object, in violation of 18 U.S.C. § 1791(a)(2).  Count Five of the indictment charged Mayes with assaulting officer Ralph Craddieth with the intent to commit mutiny, in violation of 18 U.S.C. §§ 1792 and 113(a)(2).  Count Six of the indictment charged Calhoun, Garrett and Mayes with assaulting officer Terry Bullock with the intent to commit murder, in violation of 18 U.S.C. § 113(a)(1).  Count Seven of the indictment charged Baker, Bryant, Byrd, Calhoun, Fultz, Harris, Mayes, Mimmis, Moore, Nelson and Nururdin with assaulting officer Steven Croft with the intent to commit murder, in violation of 18 U.S.C. § 113(a)(1).  Count Eight of the indictment charged Byrd and Mayes with kidnaping officer Steven Croft, in violation of 18 U.S.C. § 1201(a)(5).  Counts Nine, Ten, Twelve, Thirteen and Fourteen of the indictment respectively charged Mayes, Byrd, Fultz, Nelson and Calhoun with causing damage in excess of $100 to government property, in violation of 18 U.S.C. § 1361.

[3]Bryant, Fultz, Harris, Mayes, Moore, Nelson and Nururdin each filed motions to dismiss the superseding indictment.  Garrett, Calhoun, Byrd, Mimmis and Baker adopted the motion to dismiss.

3

testified at the hearings regarding the need for extra security precautions. In the Marshals Service's opinion, extra precautions were necessary because of the number of people being tried together and the nature of the charges against them. Accordingly, the Marshals Service proposed a plan for courtroom security during the trial that involved increasing the number of deputy marshals present during the proceedings, controlling the placement of the tables and seating of the parties, and physically restraining the appellants to restrict their movement should a disturbance arise.

With regard to the physical restraints, the Marshals Service recommended that, at minimum, the appellants wear leg irons around their ankles-a form of "shackling." Representatives of the Marshals Service testified that, in their opinions, this would be the least restrictive method of effective restraint.

The court also considered testimony regarding the appellants' collective histories of disciplinary problems and violent behavior. According to one of the deputy marshals, some of the appellants had previously been convicted of violent crimes. Lieutenant William Elston, a correctional supervisor at FCI Talladega, also testified that the appellants' prison files included incident reports for infractions such as assaulting staff, insolence and refusing orders. According to Elston, one of the appellants had even threatened to kill a witness in a prior case. With respect to the appellants' conduct after the riot, Elston testified that he interviewed some of them about the incident, and that a few became so "agitated" and "aggressive" that authorities "had to remove them from [Elston's] office." Elston also stated that one of the appellants kicked a chair and shouted an obscenity just before an arraignment was to begin in Atlanta. Moreover, Elston testified that a lieutenant who escorted some of the appellants on a bus ride to a maximum security prison in Colorado had to stop the bus and threaten to use pepper spray because some of the appellants

4

became "loud and boisterous" upon realizing that "it would be a long time before staff could respond ... if [there were] a problem" while en route. Finally, Elston stated that a lieutenant at the prison in Colorado reported having other minor disciplinary problems with some of the appellants after they were transferred from FCI Talladega.

After hearing all of the evidence, the district court carefully assessed the circumstances and decided to accept the Marshals Service's recommendation to shackle the appellants. To minimize the potential for prejudice, however, the court took several measures to ensure that the leg irons were concealed from the jurors' view. None of the appellants wore the leg irons while testifying, and the jurors never saw the appellants enter or exit the courtroom. All of the appellants were seated on the insides of two tables that were covered with long tablecloths. Two railings were also strategically positioned in the courtroom to obscure the jurors' view of the appellants' legs. Moreover, the chains of the leg irons were covered with a styrofoam-like soft rubber padding and duct tape in order to muffle the sounds of clanging metal.

The trial commenced on May 6, 1996, and on May 30, 1996, the jury returned its verdicts.[4] The district court sentenced the appellants on July 30, 1996, and this appeal followed.[5]

## II. ISSUES AND STANDARDS OF REVIEW

The first issue we address is whether the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution is violated when a prisoner is criminally prosecuted for the same behavior that formed the basis for prison disciplinary sanctions. We review *de novo* the district court's denial of the appellants' motions to dismiss the superseding indictment on double jeopardy grounds. *United States v. Benefield,* 874 F.2d 1503, 1505 (11th Cir.1989).

The second issue that merits discussion is whether the appellants were denied a fair trial as a result of being required to appear in court wearing leg irons. Our standard of review is abuse of discretion. *United States v. Theriault,* 531 F.2d 281, 284 (5th Cir.) ("The decision to shackle lies

---

[4]On Count One: all of the appellants were found guilty. On Count Two: Bryant, Byrd, Calhoun, Fultz, Harris, Mayes and Nelson were found guilty, while Nururdin was found not guilty. On Count Five: Mayes was found not guilty. On Count Six: Mayes was found guilty of the lesser-included offense of assault with a dangerous weapon with intent to do bodily harm, while Calhoun and Garrett were both found not guilty. On Count Seven: Nelson was found guilty of the lesser-included offense of assault with a dangerous weapon with intent to do bodily harm. Baker, Bryant, Calhoun, Fultz, Harris, Moore and Mayes were found guilty of the lesser-included offense of assault by striking, beating or wounding. Byrd, Mimmis and Nururdin were found not guilty. On Count Eight: the court granted the government's motion to dismiss. On Count Nine: Mayes was found not guilty. On Count Ten: Byrd was found guilty. On Count Twelve: Fultz was found guilty. On Count Thirteen: Nelson was found guilty. On Count Fourteen: Calhoun was found not guilty.

[5]The district court imposed the following sentences of imprisonment, all to run consecutive to the sentences that the appellants' had been previously serving: Baker, Garrett and Mimmis each received 70 months; Fultz received 77 months; Bryant, Calhoun, Harris, Mayes and Moore each received 84 months; Byrd and Nururdin both received 110 months; and Nelson received 120 months. In addition, the district court ordered Bryant, Byrd, Calhoun, Fultz, Garrett, Harris, Mayes, Nelson and Nururdin each to pay $50,000 in restitution to the United States Bureau of Prisons.

6

within the sound discretion of the trial court and will not be overturned by reviewing courts unless that discretion was abused."), *cert. denied,* 429 U.S. 898, 97 S.Ct. 262, 50 L.Ed.2d 182 (1976).[6]

## III. DISCUSSION

### A. Double Jeopardy

The Fifth Amendment states in part that no "person [shall] be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The Double Jeopardy Clause protects individuals against three distinct violations: (1) "a second prosecution for the same offense after acquittal"; (2) "a second prosecution for the same offense after conviction"; and (3) "multiple punishments for the same offense." *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), *overruled on other grounds, Alabama v. Smith,* 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989). The appellants rely upon the third of these types of abuses to argue that the district court erred in denying their motions to dismiss the superseding indictment.[7] Specifically, they contend that the Bureau of Prisons "punished" them with various disciplinary

---

[6]Appellants raise several additional issues on appeal, including: (1) whether the district court erred in denying their motions to sever; (2) whether the evidence was sufficient to support their convictions; (3) whether they were properly sentenced; and (4) whether the district court erred in eliciting certain information from a witness. As to all issues except double jeopardy and shackling, we find the appellants' contentions devoid of merit and affirm the district court's judgment without discussion. *See* 11th Cir. R. 36-1.

Additionally, Mayes and Fultz contend that they were denied effective assistance of trial counsel. We decline to address this issue. *See United States v. Camacho*, 40 F.3d 349, 355 (11th Cir.1994) ("Generally, we do not consider claims of ineffective assistance of counsel on direct appeal, because there usually has been insufficient opportunity to develop the record regarding the merits of these claims."), *cert. denied,* 514 U.S. 1090, 115 S.Ct. 1810, 131 L.Ed.2d 735 (1995).

[7]All of the appellants raise the double jeopardy issue on appeal except Baker, Moore and Nururdin.

sanctions and that the superseding indictment unconstitutionally subjects them to criminal liability for the same conduct that formed the basis of those disciplinary sanctions.

The appellants' argument is based primarily upon *United States v. Halper,* 490 U.S. 435, 446, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989), where the Supreme Court addressed the issue of "whether and under what circumstances a civil penalty may constitute punishment for the purpose of the Double Jeopardy Clause." Irwin Halper was sentenced to 2 years of imprisonment and fined $5,000 after being convicted of submitting 65 false claims for government reimbursement. 490 U.S. at 437, 109 S.Ct. 1892. In a subsequent civil suit against Halper brought pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3731 (1982 ed., Supp. II), the district court granted the government's motion for summary judgment on the issue of liability. 490 U.S. at 438, 109 S.Ct. 1892. Although the government actually sustained a total loss of only $585 plus the cost of investigating and prosecuting Halper's false claims, the remedial provision of the False Claims Act would have made Halper liable to the government for more than $130,000. 490 U.S. at 438-39, 109 S.Ct. 1892. In light of Halper's previous criminal punishment, the district court held that the statutorily authorized penalty would constitute a second punishment for double jeopardy purposes. 490 U.S. at 438-39, 109 S.Ct. 1892. The court therefore limited the government's recovery to double damages of $1,170 and the costs of the civil action. 490 U.S. at 440, 109 S.Ct. 1892.

The government took a direct appeal to the Supreme Court, which agreed with the district court's double jeopardy analysis.[8] The Court concluded that "a civil as well as a criminal sanction constitutes punishment when the sanction as applied in the individual case serves the goals of

---

[8]The Court, however, vacated the judgment and remanded for further proceedings "to permit the Government to demonstrate that the District Court's assessment of its injuries was erroneous." *Halper,* 490 U.S. at 452, 109 S.Ct. 1892.

8

punishment." 490 U.S. at 448, 109 S.Ct. 1892. Thus, the Court held, "a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment[.]" 490 U.S. at 448, 109 S.Ct. 1892. Under the Court's ruling, "the Government may not criminally prosecute a defendant, impose a criminal penalty upon him, and then bring a separate civil action based on the same conduct and receive a judgment that is not rationally related to the goal of making the Government whole." 490 U.S. at 451, 109 S.Ct. 1892. Accordingly, the Court found the remedial provision of the False Claims Act unconstitutional as applied to Halper, given the "overwhelmingly disproportionate" civil penalty it authorized compared to the government's actual sustained losses. 490 U.S. at 449, 452, 109 S.Ct. 1892.

The appellants use *Halper*'s rationale to support their position that the imposition of prison disciplinary sanctions—particularly the denial of visitation privileges *after* being transferred from FCI Talladega—constitute punishment for double jeopardy purposes. They contend that being disciplined at a prison other than the one where the riot occurred could not be rationally related to the government's remedial interest in maintaining institutional order. Thus, they argue, the government plainly sought to serve the goals of punishment. Although the appellants primarily take issue with the denial of visitation privileges, they also assert that the court should consider the overall severity of the various combinations of sanctions imposed in each individual appellant's case. Relying on *Halper*, they claim that the disciplinary action taken against them, considered in its totality, was unjustifiably extreme when compared with what should have been the government's only valid remedial goals: maintaining order and encouraging compliance with prison rules at FCI Talladega.

9

Prior to *Halper,* the general rule in this and other circuits appeared to be well settled: prison disciplinary sanctions do not bar subsequent criminal prosecutions on double jeopardy grounds. *See United States v. Cordova,* 414 F.2d 277, 277 (5th Cir.1969); *Garrity v. Fiedler,* 41 F.3d 1150, 1152 (7th Cir.1994) (collecting cases), *cert. denied,* 514 U.S. 1044, 115 S.Ct. 1420, 131 L.Ed.2d 303 (1995). After *Halper,* however, the issue arose whether prison disciplinary sanctions might ever be considered sufficiently excessive to constitute criminal punishment for double jeopardy purposes. Every circuit court to address this issue distinguished *Halper,* declined to recognize an exception to the general rule and rejected prisoners' double jeopardy challenges.[9]

After the parties filed their briefs in this case, but before the appellate oral argument, the Supreme Court decided *Hudson v. United States,* 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997). In *Hudson,* the Office of the Comptroller of the Currency (OCC) administratively imposed monetary penalties and occupational debarment on the petitioners, who were officials of two banks in western Oklahoma, after concluding that they had used their positions to arrange a series of loans in violation of federal banking statutes and regulations. 522 U.S. at ---- - ----, 118 S.Ct. at 491-92. The petitioners were criminally indicted on charges arising out of the same lending transactions. 522 U.S. at ----, 118 S.Ct. at 492. The district court dismissed the indictments on double jeopardy grounds, and the court of appeals reversed. The Supreme Court granted certiorari "because of concerns about the wide variety of novel double jeopardy claims spawned in the wake of *Halper.*"

---

[9]*See United States v. Galan*, 82 F.3d 639 (5th Cir.), *cert. denied,* --- U.S. ----, 117 S.Ct. 179, 136 L.Ed.2d 119 (1996); *United States v. Hernandez-Fundora*, 58 F.3d 802 (2d Cir.), *cert. denied,* 515 U.S. 1127, 115 S.Ct. 2288, 132 L.Ed.2d 290 (1995); *United States v. Brown*, 59 F.3d 102 (9th Cir.1995); *Garrity v. Fiedler*, 41 F.3d 1150 (7th Cir.1994), *cert. denied,* 514 U.S. 1044, 115 S.Ct. 1420, 131 L.Ed.2d 303 (1995); *United States v. Newby*, 11 F.3d 1143 (3d Cir.1993), *cert. denied,* 511 U.S. 1087, 114 S.Ct. 1841, 128 L.Ed.2d 468, *and cert. denied,* 513 U.S. 834, 115 S.Ct. 111, 130 L.Ed.2d 58 (1994).

10

522 U.S. at ----, 118 S.Ct. at 493. Largely "disavow[ing] the [*Halper* ] method of analysis[,]" the Court held that the Double Jeopardy Clause did not bar the petitioners' criminal prosecution because the prior OCC administrative proceedings were civil, not criminal. 522 U.S. at ----, 118 S.Ct. at 491.

Chief Justice Rehnquist, writing for the Court in *Hudson,* noted that "[t]he Clause protects only against the imposition of multiple *criminal* punishments for the same offense" occurring in successive proceedings. 522 U.S. at ----, 118 S.Ct. at 493 (emphasis added). In determining whether a particular punishment is civil or criminal in nature, courts must first attempt to ascertain the express or implied legislative intent. 522 U.S. at ----, 118 S.Ct. at 493 (citing *United States v. Ward,* 448 U.S. 242, 248, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980)). If the legislature intends the penalty to be civil, courts must then " "inquire[ ] further whether the statutory scheme was so punitive either in purpose or effect,' ... as to "transfor[m] what was clearly intended as a civil remedy into a criminal penalty[.]' " 522 U.S. at ----, 118 S.Ct. at 493 (citing *Ward,* 448 U.S. at 248-49, 100 S.Ct. 2636 and *Rex Trailer Co. v. United States,* 350 U.S. 148, 154, 76 S.Ct. 219, 100 L.Ed. 149 (1956)). The *Hudson* Court found that, "[i]n making this latter determination," the factors set forth in *Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963) "provide useful guideposts[.]" 522 U.S. at ----, 118 S.Ct. at 493. These factors include (1) "[w]hether the sanction involves an affirmative disability or restraint"; (2) "whether it has historically been regarded as a punishment"; (3) "whether it comes into play only on a finding of scienter"; (4) "whether its operation will promote the traditional aims of punishment-retribution and deterrence"; (5) "whether the behavior to which it applies is already a crime"; (6) "whether an alternative purpose to which it may rationally be connected is assignable for it"; and (7) "whether it appears excessive in relation to the alternative purpose assigned." *Kennedy,* 372 U.S. at 168-69, 83 S.Ct. 554.

11

The Chief Justice observed that the *Halper* opinion "marked the first time [that the Supreme Court] applied the Double Jeopardy Clause to a sanction without first determining that it was criminal in nature." 522 U.S. at ---- - ----, 118 S.Ct. at 493-94. Instead, *Halper* focused on the proportionality of the sanction to the harm caused, and "[i]n so doing, ... elevated a single *Kennedy* factor-whether the sanction appeared excessive in relation to its nonpunitive purposes-to dispositive status." 522 U.S. at ----, 118 S.Ct. at 494. Moreover, according to *Hudson,* another significant flaw in *Halper* was "the Court's decision to assess the character of the actual sanctions imposed, rather than, as *Kennedy* demanded, evaluating the statute on its face to determine whether it provided for what amounted to a criminal sanction." 522 U.S. at ----, 118 S.Ct. at 494 (internal quotations and citations omitted).

*Hudson* did not expressly overrule *Halper.* We need not speculate, however, whether, or to what extent, the double jeopardy principles enunciated in *Halper* remain good law. It is sufficient to recognize that the *Hudson* Court thought *Halper* to have been "ill considered" and to have "proved unworkable[,]" thereby significantly weakening the appellants' argument in this case. *Hudson,* 522 U.S. at ----, 118 S.Ct. at 494. For purposes of the present analysis, we think it safe to use *Halper*'s rationale only inasmuch as it contributes to our understanding of the fourth and seventh *Kennedy* factors-whether the sanction promotes the traditional aims of punishment and whether it appears excessive-without ascribing inordinate value to those factors.

Under *Hudson,* the decisions in *Ward* and *Kennedy* exemplify the controlling double jeopardy standards. After receiving the benefit of the Supreme Court's guidance in *Kennedy,* our predecessor circuit rendered opinions in several cases applying double jeopardy principles within

12

the context of prison disciplinary sanctions.[10] *See United States v. Bryant,* 563 F.2d 1227, 1230 (5th Cir.1977) (administrative revocation of good conduct time after participation in prison riot did not bar subsequent criminal prosecution for same conduct), *cert. denied,* 435 U.S. 972, 98 S.Ct. 1616, 56 L.Ed.2d 65 (1978); *United States v. Lepiscopo,* 429 F.2d 258, 261 (5th Cir.) (administrative forfeiture of accumulated good time credits and placement in solitary confinement after participation in escape attempt did not bar subsequent criminal prosecution for same conduct), *cert. denied,* 400 U.S. 948, 91 S.Ct. 255, 27 L.Ed.2d 254 (1970); *Gilchrist v. United States,* 427 F.2d 1132, 1133 (5th Cir.1970) (affirming denial of petition for writ of habeas corpus, holding that Double Jeopardy Clause "is not violated because a prisoner is subjected to discipline by prison authorities for violating prison regulations and is also prosecuted in the district court in a criminal action based upon the same acts"); *United States v. Cordova,* 414 F.2d 277, 277 (5th Cir.1969) (rejecting argument that "the combination of administrative punishment and criminal conviction" violated the Double Jeopardy Clause, and holding that "[a]dministrative discipline of a prisoner does not prohibit criminal prosecution for the same event"). This controlling precedent from the Former Fifth Circuit provides some guidance; however, we do not have any binding post-*Ward* decisions on the double jeopardy implications of prison discipline. We therefore undertake to analyze this issue in light of the Supreme Court's more recent double jeopardy jurisprudence.

The sanctions against the appellants in this case were imposed pursuant to 28 C.F.R. §§ 541.10-541.20 (1993). These regulations authorize "institution authorities to impose discipline on those inmates whose behavior is not in compliance with Bureau of Prisons rules." 28 C.F.R. §

---

[10]In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981.

541.10(a). Section 541.13 delineates the various types of prohibited acts and groups them into categories based upon the seriousness of the infraction. *See* 28 C.F.R. § 541.13, Table 3. The "Disciplinary Severity Scale" then describes the types of authorized sanctions that officials have discretion to impose based upon the category into which the prohibited act falls. *See* 28 C.F.R. § 541.13, Tables 3-6. The regulations also set forth detailed procedural guidelines that institutional staff must follow when bringing disciplinary action against an inmate. *See* 28 C.F.R. §§ 541.14-541.19.

Under *Ward,* our first task is to determine whether the government intended the proceedings under these regulatory provisions to be "criminal" or "civil." No express preference for one label or the other appears on the face of the statute. *See S.A. Healy Co. v. Occupational Safety and Health Review Comm'n,* 138 F.3d 686, 688 (7th Cir.1998) ("The first inquiry is whether Congress has designated the penalty as civil or criminal."); *Mayers v. United States Dep't of Health and Human Servs.,* 806 F.2d 995, 998 (11th Cir.1986) (noting that the labeling of a sanction as "civil" is determinative of the government's intent), *cert. denied,* 484 U.S. 822, 108 S.Ct. 82, 98 L.Ed.2d 44 (1987). We therefore turn to the overall purpose expressed in the regulations themselves to derive the government's implied intent. *See, e.g., United States v. Imngren,* 98 F.3d 811, 815 (4th Cir.1996). Section 541.10(a) states that the disciplinary provisions exist "[s]o that inmates may live in a safe and orderly environment[.]" To this end, "[s]taff shall take disciplinary action at such times and to the degree necessary to regulate an inmate's behavior[.]" 28 C.F.R. § 541.10(b)(2). The regulations therefore explicitly articulate only a nonpunitive, remedial purpose. We find this persuasive proof that the government intended for the disciplinary regulations to be civil in nature, not criminal. *See Imngren,* 98 F.3d at 815-16 (remedial purposes expressly stated in regulation

14

contributed to finding of governmental intent to create civil sanction); *Herbst v. Voinovich,* 9 F.Supp.2d 828, 835 (N.D.Ohio 1998) (statute's remedial purpose relevant to finding that it was civil in nature).

Moreover, the regulatory scheme contemplates that some violations of Bureau of Prisons rules could result in criminal prosecution. Section 541.14(b)(1) provides that an investigation of alleged inmate misconduct "shall [be] suspend[ed]" whenever "it appears likely that the incident may be the subject of criminal prosecution[.]" Also, section 541.16(a) states: "Each Bureau of Prison institution shall have an independent hearing officer (DHO) assigned to conduct administrative fact-finding hearings covering alleged acts of misconduct and violations of prohibited acts, including those acts which could result in criminal charges." In expressly distinguishing the prison disciplinary process from criminal prosecutions, this language further confirms that the government intended to create civil sanctions through the regulatory scheme at issue. *See, e.g., Ward,* 448 U.S. at 249, 100 S.Ct. 2636 (finding that the label of "civil penalty" took on "added significance given its juxtaposition with the criminal penalties set forth in the immediately preceding subparagraph").

Finally, conferring this type of authority upon an administrative agency, such as the Bureau of Prisons, is "prima facie evidence that Congress intended to provide for a civil sanction." *Hudson,* 522 U.S. at ----, 118 S.Ct. at 495 (citing *Wong Wing v. United States,* 163 U.S. 228, 235, 16 S.Ct. 977, 41 L.Ed. 140 (1896) for the proposition that "quintessential criminal punishments may be imposed only "by a judicial trial' ").

The second prong of our inquiry is whether the "clearest proof" exists to show that the sanctions authorized in these regulations are "so punitive in form and effect as to render them criminal despite [the government's] intent to the contrary." *United States v. Ursery,* 518 U.S. 267,

15

290, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996). We note first that, under *Hudson,* we attribute no significance to the sanctions actually imposed in order to determine whether these appellants were criminally punished for double jeopardy purposes. *Hudson,* 522 U.S. at ---- - ----, 118 S.Ct. at 494-95. Rather, we "evaluat[e] the "statute on its face' to determine whether it provide[s] for what amount[s] to a criminal sanction[.]" *Hudson,* 522 U.S. at ----, 118 S.Ct. at 494 (citing *Kennedy,* 372 U.S. at 169, 83 S.Ct. 554); *see also Cole v. United States Dep't of Agric.,* 133 F.3d 803, 807 n. 4 (11th Cir.1998). Thus, we are not at liberty to consider the overall severity of the administrative discipline meted out to each of the appellants in this case. Instead, the pertinent inquiry is whether the authorized civil sanctions for violations of prison rules are so punitive as to be transformed into criminal punishment. It is at this analytical stage that the seven *Kennedy* factors come into play.

Before embarking upon this effort to assess the relative "punitiveness" of the regulatory scheme at issue, we note that prison discipline cases do not fit neatly into the matrix of double jeopardy doctrine. This is because in the prison context, virtually any form of sanction seems "criminal" and "punitive" as we commonly understand those terms. With that in mind, we recognize that many of the *Kennedy* factors may weigh in the appellants' favor and support their argument that the disciplinary regulations constitute criminal punishment for double jeopardy purposes. For instance, because the appellants are already incarcerated, some of the authorized sanctions will inevitably "involve[ ] an affirmative disability or restraint" for purposes of the first factor. *Kennedy,* 372 U.S. at 168, 83 S.Ct. 554. In the same vein, some of these sanctions might also be "historically ... regarded as a punishment," given the context. 372 U.S. at 168, 83 S.Ct. 554. With respect to the third *Kennedy* factor-whether the sanction "comes into play only on a finding of scienter"-the regulatory provisions make clear that an inmate's mental state at the time he is alleged to have

16

engaged in misconduct is relevant to determining whether disciplinary action is appropriate. 372 U.S. at 168, 83 S.Ct. 554. *See* 28 C.F.R. § 541.10(b)(6). The fourth consideration is whether the sanction "promote[s] the traditional aims of punishment." 372 U.S. at 168, 83 S.Ct. 554. Indeed, the imposition of discipline in prison seems aimed, at least in part, at deterring inmates from violating institutional rules in the future. Fifth, many of the prohibited acts to which these sanctions apply are "already ... crime[s]." 372 U.S. at 168, 83 S.Ct. 554. The last two *Kennedy* factors, on the other hand, probably weigh against the appellants in that the disciplinary sanctions could be regarded as "rationally ... connected" to an alternative, nonpunitive purpose-namely, maintaining institutional order-without "appear[ing] excessive" in relation to that purpose. 372 U.S. at 168-69, 83 S.Ct. 554.

We have some flexibility in determining the extent that we choose to utilize the considerations enunciated in *Kennedy* for purposes of our double jeopardy analysis. *See Hudson,* 522 U.S. at ----, 118 S.Ct. at 493 (classifying *Kennedy* factors as "useful guideposts"); *Ward,* 448 U.S. at 249, 100 S.Ct. 2636 (describing *Kennedy* factors as "helpful," but "neither exhaustive nor dispositive"). We therefore exercise our discretion to attribute less significance to *Kennedy*'s list of considerations in this particular case, primarily because it arises within the prison context. In this unique setting, we must take into account the fact that a prison's remedial and punitive interests are inextricably related. As the Second Circuit observed, "[p]unitive interests and remedial interests ... are nowhere so tightly intertwined as in the prison setting, where the government's remedial interest is to maintain order and to prevent violent altercations among a population of criminals" and where "remedial concerns require "punishing' individuals for violent or other disruptive conduct[.]" *United States v. Hernandez-Fundora,* 58 F.3d 802, 806, 807 (2d Cir.1995).

17

Moreover, we factor into our analysis the importance of granting some deference to the judgments of prison authorities in determining "what is necessary and proper to preserve institutional order and discipline, and to encourage good conduct[.]" *United States v. Newby,* 11 F.3d 1143, 1146 (3d Cir.1993); *see also Garrity v. Fiedler,* 41 F.3d 1150, 1153 (7th Cir.1994) ("Historically, we have deferred to the expertise of prison authorities regarding questions of prison administration and discipline."). Accordingly, we recognize the need to refrain from hindering institutional administration. We find the Third Circuit's reasoning persuasive in this regard:

> We do not believe that the Double Jeopardy Clause was ever intended to inhibit prison discipline.... If a prison disciplinary sanction bars subsequent criminal prosecution, the prison authorities will be forced to choose between instituting a disciplinary proceeding or awaiting a criminal prosecution. The process of conducting a criminal investigation and prosecution may take considerable time. The difficulties and delay that a criminal prosecution entails would leave the prisoners who violated the prison rules without a prompt resolution of charges and hinder prison administration and discipline.

*Newby,* 11 F.3d at 1146.

Prison officials have no authority to alter the inmates' original criminal sentences. They merely implement disciplinary proceedings that may, at most, change the conditions of the inmates' confinement for purposes of maintaining institutional order and encouraging compliance with prison rules.

Under these circumstances, we cannot conclude that the regulations authorizing the prison disciplinary sanctions imposed against these appellants are so punitive as to override the government's intent to create remedial administrative penalties for inmate misconduct. Accordingly, we decline to classify the regulations as "criminal," and the appellants' double jeopardy challenge fails. We therefore affirm the district court's denial of the appellants' motions to dismiss the superseding indictment.

18

B. Shackling

"The right to a fair trial is a fundamental liberty[.]" *Estelle v. Williams,* 425 U.S. 501, 503, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). One of the "basic component[s]" of a fair trial is the presumption of innocence. 425 U.S. at 503, 96 S.Ct. 1691. "To implement the presumption, courts must be alert to factors that may undermine the fairness of the fact-finding process." 425 U.S. at 503, 96 S.Ct. 1691. One such factor is the shackling of a criminal defendant.

Because of the potentially deleterious effect that shackling can have on an accused's constitutional rights, this court has cautioned that "the use of shackles to restrain a defendant at trial should rarely be employed as a security device." *Zygadlo v. Wainwright,* 720 F.2d 1221, 1223 (11th Cir.1983), *cert. denied,* 466 U.S. 941, 104 S.Ct. 1921, 80 L.Ed.2d 468 (1984). The Supreme Court has also noted that "no person should be tried while shackled ... except as a last resort." *Illinois v. Allen,* 397 U.S. 337, 344, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). Not only do the presence of shackles erode the presumption of innocence, but physical restraints may also "confuse the defendant, impair his ability to confer with counsel, and significantly affect the trial strategy he chooses to follow." *Zygadlo,* 720 F.2d at 1223. Moreover, shackles are "an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold." *Illinois v. Allen,* 397 U.S. at 344, 90 S.Ct. 1057.

Nevertheless, under some circumstances, shackling "is necessary for the safe, reasonable and orderly progress of trial." *United States v. Theriault,* 531 F.2d 281, 284 (5th Cir.1976). Courtroom security is a competing interest that may, at times, "outweigh[ ] a defendant's right to stand before the jury untainted by physical reminders of his status as an accused." *Allen v. Montgomery,* 728 F.2d 1409, 1413 (11th Cir.1984). We grant trial judges reasonable discretion in

balancing these interests and determining whether to physically restrain a criminal defendant. *See Zygadlo,* 720 F.2d at 1223.

The appellants argue that the district court's decision to require that they appear in court wearing leg irons deprived them of a fair trial.[11] They claim that the court erred in taking into consideration the general nature of the charges without making individualized determinations as to the appropriateness of shackles for each appellant. They also assert that the court should not have used shackling as a preventative security measure, but rather, that the court should have made the decision to utilize restraints, if at all, only after any disruption actually occurred. Moreover, the appellants contend that the district court abused its discretion in deferring to the recommendation of the Marshals Service on the shackling issue.

We find the appellants' arguments unpersuasive. The district court's decision to physically restrain the appellants with leg irons was an entirely reasonable exercise of its discretion under these circumstances. The court made a careful and informed decision only after considering the evidence adduced from several witnesses at two separate hearings on the issue of security. Defense counsel had an opportunity to cross-examine these witnesses, argue their positions to the court, and propose alternative methods of restraint. *See United States v. Brazel,* 102 F.3d 1120, 1157 (11th Cir.) (affirming district court's shackling decision in part because "the court gave defense counsel the opportunity to respond to its concerns and the proposed actions, and to raise alternative proposals"), *cert. denied,* --- U.S. ----, ----, 118 S.Ct. 78, 79, 139 L.Ed.2d 37 (1997), *and cert. denied,* --- U.S. ----, 118 S.Ct. 720, 139 L.Ed.2d 659 (1998). Properly factoring into the district court's decision

---

[11]Harris and Mayes both argue the shackling issue in their briefs. Calhoun, Fultz, Garrett and Mimmis adopt their arguments.

20

were the appellants' prison disciplinary records, collective histories of violent crimes, and misconduct in prior judicial proceedings. *See Theriault,* 531 F.2d at 284-85 (affirming district court's shackling decision, which was based upon the defendant's prison disciplinary record, prior escapes from custody and past obstreperous conduct in judicial proceedings); *see also Woods v. Thieret,* 5 F.3d 244, 248 n. 7 (7th Cir.1993) ("It is quite obvious that a prisoner with a violent criminal history and serving a long prison sentence is more likely to disrupt the courtroom or attempt an escape because he may mistakenly believe he has nothing to lose.").

Contrary to the appellants' assertions, the court was also justified in taking into account the fact that sixteen defendants were being tried together on charges of participating in a prison riot. It was not unreasonable for the court to recognize that these exceptional circumstances posed a potential security problem, and the court was not required to ignore this risk. On these facts, we simply cannot conclude that the district court abused its discretion in failing to "wait and see" if a disturbance arose before deciding to impose physical restraints.

The court was also entitled to rely in part upon the expertise and experience of the Marshals Service in making its decision. Indeed, the federal marshals' statutorily-defined duties include "provid[ing] for the personal protection of Federal jurists, court officers, [and] witnesses[.]" 28 U.S.C.A. § 566(e)(1)(A) (West 1993). Nevertheless, we note that it is ultimately the district court's duty to decide upon the appropriateness of using physical restraints during the trial of a criminal defendant. *See Allen v. Montgomery,* 728 F.2d at 1413 n. 3 (intimating that "the decision to try a defendant in handcuffs is normally one to be made by the trial judge"). The Seventh Circuit has noted that "[w]hile the trial court may rely heavily on the marshals in evaluating the appropriate security measures to take with a given prisoner, the court bears the ultimate responsibility for that

21

determination and may not delegate the decision to shackle an inmate to the marshals." *Woods,* 5 F.3d at 248 (internal quotation marks omitted). As we have discussed, the decision to shackle has significant constitutional implications. Accordingly, we recognize that trial judges should not blindly defer to the recommendation of law enforcement officials as to the appropriateness of shackling without independently reviewing the facts and circumstances thought to warrant such a security measure and carefully considering the legal ramifications of that decision.

In this case, however, the district court's decision to consider and agree with the recommendation of the Marshals Service was an informed one. The record reflects that the court decided to accept the recommendation to impose physical restraints only after weighing all the evidence and taking into account all parties' concerns. Thus, the district court did not blindly defer to the Marshal's recommendation, as the appellants suggest. Rather, the court considered the official recommendation *in addition to* the remainder of the evidence presented at the hearings. *See Theriault,* 531 F.2d at 284 (noting that, in addition to several other reasons for shackling the defendant, the district court also "openly deferred to the expertise and advice of the United States Marshal") (internal quotation omitted); *see also Allen v. Montgomery,* 728 F.2d at 1413 n. 3 (finding "no constitutional error in permitting the sheriff to decide what forms of security were necessary to bring Allen safely to trial").

Having considered the totality of the circumstances, we find no abuse of discretion in the district court's decision that shackling was appropriate during the course of the appellants' trial and that leg irons were the least restrictive method of effective restraint. We also conclude, however, that even if the court had abused its discretion, the appellants have failed to demonstrate that the presence of the physical restraints prejudiced them in any way. In *Illinois v. Allen,* the Supreme

22

Court observed that "the *sight* of shackles ... might have a significant effect on the jury's feelings about the defendant[.]" 397 U.S. at 344, 90 S.Ct. 1057 (emphasis added). The restraints in this case were not capable of affecting the jury's attitude in any way because the district court took great care to ensure that the jury never saw that the appellants were wearing leg irons. The record reflects that tablecloths and railings concealed the appellants' legs from the jury's view; the jury never saw the appellants enter or exit the courtroom; and none of the appellants who testified wore their leg irons while doing so. *See Brazel,* 102 F.3d at 1158 (finding no "realistic likelihood" of prejudice where shackles were "screened from view" with tablecloths). Moreover, the chains were padded to muffle any sounds.

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED.