Andre PORTER, Plaintiff–Appellant,

v.

Thomas A. COUGHLIN, III, Commissioner, New York State Department of Correctional Services; Frank E. Irvin, Superintendent, Wende Correctional; Walter, Acting Captain, Wende Correctional; Donald Selsky, Commissioner Designee, Director of Disciplinary Hearing; John P. Keane, Superintendent of Sing Sing Correctional Facility, Defendants–Appellees.

Docket No. 03–0273.

United States Court of Appeals, Second Circuit.

Submitted: May 9, 2005.

Decided: Aug. 31, 2005.

Hugh M. Russ III (Patrick J. Long, on the brief), Hodgson Russ LLP, Buffalo, NY, for plaintiff-appellant.

Marlene O. Tuczinski, Assistant Solicitor General (Eliot Spitzer, Attorney General of the State of New York, Peter H. Schiff, of counsel), Albany, NY, for defendants-appellees.

Before: SOTOMAYOR and B.D. PARKER,* Circuit Judges.

SOTOMAYOR, Circuit Judge.

Plaintiff-appellant Andre Porter ("Porter") appeals from an order and judgment of the United States District Court for the Western District of New York (Curtin, J.), entered on September 3, 2003. The order denied Porter's motion for reconsideration of a prior order, entered May 7, 1997, that dismissed his double jeopardy claim, brought under 42 U.S.C. § 1983, relating to a prison disciplinary proceeding based on a criminal conviction. We hold that *Hudson v. United States*, 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997), does not affect this Circuit's pre-*Hudson* conclusion in *United States v. Hernandez–Fundora*, 58 F.3d 802 (2d Cir.1995), that criminal prosecutions and prison disciplinary proceedings based on the same conduct do not implicate double jeopardy concerns.

## BACKGROUND

In 1991, Andre Porter participated in a prison riot at the Southport Correctional Facility in Chemung County, New York. After the riot, the prison held a Tier III disciplinary hearing,[1] based on a misbehavior report charging Porter with rioting and engaging in violent conduct. Porter was found guilty and ordered confined to three years in a Special Housing Unit (SHU). The determination was affirmed on administrative appeal in 1991, but later annulled in 1993 by the Appellate Division, Third Department, on the grounds that the hearing officer had not provided certain documents to Porter. *See Matter of Porter v. Cuomo*, 191 A.D.2d 852, 853, 594 N.Y.S.2d 857 (3d Dep't 1993) (reviewing administrative determination under N.Y. C.P.L.R. §§ 7801–7806 ("Article 78")). The matter was remitted "for further proceedings not inconsistent with this Court's decision." *Id.* at 854, 594 N.Y.S.2d 857.

In 1992, before the Third Department's annulment of the disciplinary determination, a Chemung County grand jury indicted Porter for the Penal Law offense of "promoting prison contraband," based on allegations that he had possessed a handmade knife during the riot. N.Y. Penal Law § 205.25. Following a trial, Porter was convicted, and on December 22, 1992, the state court sentenced him to an additional three to six years of incarceration. The judgment was affirmed on appeal. *See People v. Porter*, 220 A.D.2d 884, 632 N.Y.S.2d 336 (3d Dep't 1995), *lv. denied*, 87

---

* Because the Honorable Richard C. Wesley recused himself shortly prior to submission, a two judge panel decided this case. *See* 2d Cir. R. § 0.14(b) (interim rule).

1. Inmates in New York correctional facilities are subject to three levels of disciplinary hearings for violating prison rules, pursuant to regulations codified in the Official Compilation of Codes, Rules, and Regulations of the State of New York. *See* N.Y. Comp Codes R. & Regs. tit. 7, §§ 270.2, 270.3. Tier I hearings address the least serious offenses, which can be punished by loss of privileges such as recreation and commissary purchases. *See id.* at § 252.5. Tier II hearings address more serious infractions, for which inmates are subject to up to 30 days of confinement in a Special Housing Unit (SHU). *See id.* at § 253.7. The most serious violations are the subject of Tier III hearings and may result in SHU confinement for the remainder of the inmate's prison time, as well as forfeiture of "good time" credits. *See id.* at § 254.7; *McEachin v. McGuinnis*, 357 F.3d 197, 199 n. 1 (2d Cir.2004).

N.Y.2d 1023, 644 N.Y.S.2d 157, 666 N.E.2d 1071 (1996).

In 1993, after the Third Department had annulled the 1991 disciplinary determination, and after Porter's conviction by the Chemung County Court, prison officials held another Tier III disciplinary proceeding. A new misbehavior report charged Porter with violating Rule 1.00 of the Department of Correctional Services (DOCS) Standards of Inmate Behavior. Rule 1.00 as it stood then provided in relevant part:

> All Penal Law offenses are prohibited and may be referred to law enforcement agencies for prosecution through the courts. In addition, departmental sanctions may be imposed for criminal behavior.

N.Y. Comp Codes R. & Regs. tit. 7, § 270.2(A) (1993). The misbehavior report for the 1992 proceeding included the allegation that:

> [o]n December 1, 1992, Inmate Porter was indicted for the crime of Promoting Prison Contraband 1 (Indictment # 92–95). Inmate Porter was subsequently found guilty of the charge by verdict and received 3–0–0–/6–0–0 years sentence on December 22, 1992 by order of the Chemung County Court.

At the 1993 Tier III hearing on the new misbehavior report, Acting Captain Walter explained several times that the subject of the misbehavior report was the 1992 criminal conviction in Chemung County Court, not the events of the prison riot at Southhold. Following the hearing, Porter was found guilty of violating Rule 1.00 and was ordered confined in SHU for five years. Captain Walker stated:

> As to the disposition, I find you guilty of the charge signed into the report . . . Statement of Evidence relied upon is a written report of Correction Counselor Mecca on the guilty verdict rendered by the Chemung County Court for promot-

> ing prison contraband first degree. This disposition is given to impress you of the seriousness of your act. This disposition will impress upon you the fact that conduct such as this will not be tolerated, and serve as a deterrent for future misconduct.

The disposition was later reduced to three years.

Porter challenged the 1993 disciplinary determination in Supreme Court, Erie County, claiming, *inter alia,* that DOCS violated his right against double jeopardy by disciplining him for violating Rule 1.00. The Appellate Division, Fourth Department, confirmed the second determination and held that this disciplinary sanction "[did] not raise double jeopardy concerns." *Matter of Porter v. Irvin,* 206 A.D.2d 925, 925, 615 N.Y.S.2d 953 (4th Dep't) (citing *People v. Rivera,* 189 A.D.2d 920, 592 N.Y.S.2d 482 (3d Dep't 1993)), *lv. denied,* 84 N.Y.2d 810 (1994).

In 1995, Porter filed a *pro se* complaint under 42 U.S.C. § 1983 against DOCS employees relating to his confinement in SHU, alleging, *inter alia,* violations of his rights under the Eighth and Fourteenth Amendments, as well as violations of state law. Defendants moved for summary judgment in September 1996, asserting qualified immunity and an absence of triable issues of fact. On May 7, 1997, the district court granted partial summary judgment to defendants, dismissing all claims relevant to this appeal. In passing, the district court noted that the disciplinary proceeding sanctioning Porter for his criminal conviction did not raise any double jeopardy concerns, because "[t]he hearing was not an opportunity for plaintiff to reargue the merits of the underlying charge. The prison officials had the opportunity to impose their own penalty on plaintiff for his involvement in the Southport riot without implicating double jeop-

ardy." *Porter v. Coughlin,* 964 F.Supp. 97, 103 (W.D.N.Y.1997).

The court appointed counsel for Porter in January 2000 to pursue his remaining claims. Defendants again moved for summary judgment in 2001, and while the summary judgment motion was pending, Porter sought permission to file a motion for reconsideration of the May 7, 1997 judgment, which he characterized as "dismissing the double jeopardy claim."[2] Porter argued that in light of *Hudson v. United States,* decided shortly before his motion, the law of double jeopardy had changed in Porter's favor. The district court granted the defendants' motion for summary judgment and denied Porter's motion for reconsideration of the May 7, 1997 judgment. *Porter v. Selsky,* 287 F.Supp.2d 180 (W.D.N.Y.2003). The court held that *Hudson* did not undermine the correctness of its judgment with respect to Porter's double jeopardy claim. *Id.* at 189–90. The district court reasoned that *Hudson* has not altered the "traditional rule that prison disciplinary sanctions do not trigger the protections of the double jeopardy clause," but observed that our Court "has not substantively weighed in on the issue" since *Hudson* was decided. *Id.* at 190.

This timely appeal followed.

## DISCUSSION

■ We review *de novo* the district court's grant of summary judgment. *See Mack v. Otis Elevator Co.,* 326 F.3d 116, 119 (2d Cir.2003), *cert. denied,* 540 U.S.

1016, 124 S.Ct. 562, 157 L.Ed.2d 428 (2003). The Fifth Amendment's Double Jeopardy Clause provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." The clause protects individuals from three types of violations: (1) a second prosecution after acquittal for the same offense, (2) a second prosecution after conviction for the same offense, and (3) multiple punishments for the same offense. *United States v. Lopez,* 356 F.3d 463, 467 (2d Cir.2004).

■ In *United States v. Halper,* 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989), the Supreme Court addressed the issue of "whether and under what circumstances a civil penalty may constitute punishment for the purpose of the Double Jeopardy Clause." *Id.* at 446, 109 S.Ct. 1892. The *Halper* Court held that a civil fine could constitute "punishment" for double jeopardy purposes, notwithstanding the civil penalty label, where there was a "tremendous disparity" between the civil penalty and the government's actual damages. *Id.* at 449, 452, 109 S.Ct. 1892. Where "the civil penalty sought in the subsequent proceeding bears no rational relation to the goal of compensating the Government for its loss," *id.* at 449, 109 S.Ct. 1892, the civil sanction "may not fairly be characterized as remedial, but only as a deterrent or retribution." *Id.*

In *United States v. Hernandez–Fundora,* 58 F.3d 802 (2d Cir.1995), this Court declined to extend *Halper*'s analysis to

2. As defendants correctly point out, Porter's initial complaint made no explicit double jeopardy claims. The district court was well within its discretion, however, in liberally construing the *pro se* complaint as raising a double jeopardy claim, particularly because Porter's initial summary judgment submissions—arguing his due process claim—explained the disciplinary proceedings' impro-

priety in terms best understood through the lense of double jeopardy. *See Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) ("[T]he pleadings of a *pro se* plaintiff must be read liberally and should be interpreted 'to raise the strongest arguments that they suggest.'") (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)).

sanctions imposed in a prison disciplinary proceeding. In that case, defendant Hernandez–Fundora broke a fellow inmate's jaw by striking him in the face. *Id.* at 804. Based on the assault, the prison placed him in disciplinary segregation in the SHU for at least forty-five days. *Id.* at 805. Several months later, a grand jury indicted Hernandez–Fundora for assault based on the incident, and a jury subsequently returned a guilty verdict. *Id.* at 805. Hernandez–Fundora challenged the indictment and conviction arguing that the disciplinary segregation qualified as punishment within the meaning of the Double Jeopardy Clause. *Id.*

We disagreed, holding that it is "well settled that 'punishment' imposed by prison authorities for infractions of prison regulations does not generally bar a subsequent criminal prosecution for the same conduct." *Id.* at 806. We rejected the argument that *Halper* required vacatur of Hernandez–Fundora's conviction, noting that "[p]unitive interests and remedial interests ... are nowhere so tightly intertwined as in the prison setting, where the government's remedial interest is to maintain order and to prevent violent altercations among a population of criminals." *Id.* We observed that prison sanctions are not "punishment" for the purposes of double jeopardy analysis merely because the disciplinary sanction has a punitive component. *Id.* Quoting a post-*Halper* decision from the Third Circuit that rejected a prisoner's attempt to categorize a prison disciplinary proceeding as punishment for double jeopardy purposes, we observed that

"as a general rule a prison disciplinary sanction does not bar subsequent criminal prosecution. The disciplinary sanctions imposed in this case are not so grossly disproportionate to the remedial goal of maintaining order and discipline in the prison as to constitute a punish-

ment within the meaning of the Double Jeopardy Clause as interpreted in *Halper.*"

*Id.* at 807 (quoting *United States v. Newby,* 11 F.3d 1143, 1146 (3d Cir.1993)).

In *Hudson v. United States,* a divided Supreme Court disavowed *Halper.* *Hudson,* 522 U.S. at 102, 118 S.Ct. 488. The Court emphasized that the Double Jeopardy Clause "protects only against the imposition of multiple *criminal* punishments for the same offense." *Id.* at 99, 118 S.Ct. 488 (emphasis in original). Although identifying "[w]hether a punishment is criminal or civil is, at least initially, a matter of statutory construction," *id.,* the Court found that *Halper* had given insufficient consideration to the text of the statute at issue. *Id.* at 102, 118 S.Ct. 488. *Hudson* instructs courts to ask first "whether the legislature, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other," and second, to inquire whether the statutory scheme is "so punitive in either purpose or effect as to transform what was clearly intended as a civil remedy into a criminal penalty." *Id.* at 99, 118 S.Ct. 488 (internal citations, quotation marks, and alteration omitted). This second inquiry, in turn, is to be resolved by consulting seven factors, originally enumerated in *Kennedy v. Mendoza–Martinez:*

(1) "[w]hether the sanction involves an affirmative disability or restraint"; (2) "whether it has historically been regarded as a punishment"; (3) "whether it comes into play only on a finding of *scienter* "; (4) "whether its operation will promote the traditional aims of punishment—retribution and deterrence"; (5) "whether the behavior to which it applies is already a crime"; (6) "whether an alternative purpose to which it may rationally be connected is assignable for

it"; and (7) "whether it appears excessive in relation to the alternative purpose assigned."

*Hudson,* 522 U.S. at 99–100, 118 S.Ct. 488 (quoting *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963)). *Hudson* cautioned that courts must consider these factors in relation to the facial meaning of the statute and warned that "only the clearest proof" would "override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Id.* at 100, 118 S.Ct. 488 (internal quotation marks and citation omitted).

Applying these factors to administrative fines and occupational disbarment imposed by the Office of the Comptroller of the Currency (OCC) on bank officials for arranging loans in violation of federal statutes, the Court found the penalties civil in nature. *Id.* at 103–05, 118 S.Ct. 488. The Court recognized that the imposition of civil penalties on the misbehaving bankers would deter others from engaging in the same conduct, "a traditional goal of criminal punishment." *Id.* at 105, 118 S.Ct. 488. "[T]he mere presence of this purpose," however, did not suffice to transform a civil penalty into a criminal one, as deterrence "may serve civil as well as criminal goals." *Id.* (internal quotation marks omitted). The Court thus concluded:

> [T]he [OCC] sanctions at issue here, while intended to deter future wrongdoing, also serve to promote the stability of the banking industry. To hold that the mere presence of a deterrent purpose renders such sanctions "criminal" for double jeopardy purposes would severely undermine the Government's ability to engage in effective regulation of institutions such as banks.

*Id.*

■ We must therefore re-examine the question of whether prison disciplinary proceedings are criminal sanctions for purposes of double jeopardy analysis, applying the test laid out in *Hudson. See generally United States v. Mayes,* 158 F.3d 1215, 1222–25 (11th Cir.1998) (applying *Hudson* to prison disciplinary sanctions, and finding them not "criminal" for double jeopardy purposes).

The first prong of the *Hudson* analysis requires us to assess whether the New York state legislature, in creating the sanction mechanism at issue, indicated a preference for a civil or criminal label. *Hudson,* 522 U.S. at 99, 118 S.Ct. 488. The caption of the provision at issue here describes the provision's purpose as regulating inmate behavior, a civil remedial purpose. *See* N.Y. Comp Codes R. & Regs. tit. 7, § 270.2 ("Standards of inmate behavior"). In addition, the New York Court of Appeals has interpreted this provision of the disciplinary rules as civil rather than punitive in nature. In *People v. Vasquez,* 89 N.Y.2d 521, 531–33, 655 N.Y.S.2d 870, 678 N.E.2d 482 (1997), a pre-*Hudson* case, the Court of Appeals declined to extend *Halper*'s double jeopardy analysis to N.Y. Comp Codes R. & Regs. tit. 7, § 270.2. As *Vasquez* stated:

> Prison disciplinary proceedings have long been viewed in this State, and in many other States, as civil in nature. The scope of conduct covered by the standards of inmate behavior is far broader than conduct subject to criminal sanctions under the Penal Law .... That such rules are necessary to the safe, orderly, and effective functioning of prisons seems to us so fundamental as to require no further elaboration.

*Id.* at 532, 655 N.Y.S.2d 870, 678 N.E.2d 482 (internal citations omitted). The Court further explained that "prison disciplinary rules serve the noncriminal goals of maintaining prison safety (for inmates and corrections personnel), discipline and

order," and that it "must afford deference to the decisions of the Legislature and prison authorities as to what discipline is necessary and proper to serve these important institutional interests. While sanctions do have a deterrent effect, that deterrent effect is aimed exclusively at deterring conduct within the prison setting." *Id.* (citation omitted). These are strong indications that the State of New York intends the DOCS regulation to be civil, rather than punitive, in nature.

■ Under the second prong of the *Hudson* analysis, we apply the *Kennedy* factors to assess whether "the clearest proof" indicates that the sanctions are "so punitive in form and effect as to render them criminal despite [the state's] intent to the contrary." *United States v. Ursery,* 518 U.S. 267, 290, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996). *See Hudson,* 522 U.S. at 100, 118 S.Ct. 488. At the outset, we observe that while the *Kennedy* factors "provide useful guideposts," *Hudson,* 522 U.S. at 99, 118 S.Ct. 488, we need not apply them rigidly. *See United States v. Ward,* 448 U.S. 242, 249, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980) (characterizing *Kennedy* factors as "neither exhaustive nor dispositive"); *Mayes,* 158 F.3d at 1224 ("We have some flexibility in determining the extent that we choose to utilize the considerations enunciated in *Kennedy* for purposes of our double jeopardy analysis."). It is particularly appropriate to apply the factors flexibly in the context of prison discipline cases, which "do not fit neatly into the matrix of double jeopardy doctrine . . . because in the prison context, virtually any form of sanction seems 'criminal' and 'punitive' as we commonly understand those terms." *Mayes,* 158 F.3d at 1223;

*see also Hernandez–Fundora,* 58 F.3d at 806–07.

A number of the *Kennedy* factors would appear to support Porter's argument that the disciplinary proceeding is criminal in nature rather than civil. *See Mayes,* 158 F.3d at 1223. The first and second *Kennedy* factors, for example, inquire as to whether a sanction involves "an affirmative disability or restraint," as confinement in the SHU certainly does, and whether it "has historically been regarded as a punishment." *Kennedy,* 372 U.S. at 168, 83 S.Ct. 554; *see Mayes,* 158 F.3d at 1223–24. It is not hard to imagine that prisoners, at least, regard SHU confinement as punishment. Also, the disciplinary sanction here was triggered by a criminal conviction which incorporated a finding of criminal intent, and so the disciplinary sanction came into play "only on a finding of *scienter*," as required by the third *Kennedy* factor.[3] *See Kennedy,* 372 U.S. at 168, 83 S.Ct. 554. Applying the fourth factor, we note that the purpose of the disciplinary sanction, particularly in this case, is apparently to deter inmates from repeating their criminal conduct within the prison system and therefore to "promote the traditional aims of punishment." *Id; see also Mayes,* 158 F.3d at 1223. As to the fifth factor, the commission of "Penal Law offenses" under Rule 1.00 is clearly "already a crime." *Kennedy,* 372 U.S. at 168, 83 S.Ct. 554.

In contrast, the final two *Kennedy* factors weigh heavily against Porter. Sanctioning prisoners for Penal Law offenses is certainly " 'rationally . . . connected' to an alternative, nonpunitive purpose—namely, maintaining institutional order—without 'appearing excessive' in relation to that purpose." *Mayes,* 158 F.3d at 1224 (quot-

---

**3.** This is, of course, not true of strict liability crimes, but we need not consider such crimes here.

ing *Kennedy,* 372 U.S. at 168–69, 83 S.Ct. 554). Applying the sixth *Kennedy* factor, we find that the rational connection to an alternative, nonpunitive purpose could hardly be more apparent. *See Hudson,* 522 U.S. at 99, 118 S.Ct. 488. If prison officials fail to sanction those involved in a prison riot, severe problems maintaining order in the prison may quickly follow. Furthermore, confinement in the SHU made it less likely that Porter would participate in further violent acts against others, and the prevention of inmate violence is inarguably a legitimate nonpunitive purpose. The seventh factor, too, weighs heavily against Porter, *see Hudson,* 522 U.S. at 99–100, 118 S.Ct. 488, because the actual sanction he received was not at all excessive in light of the events that prompted it.

The line between civil and criminal sanctions is often hard to draw, and this is nowhere more true than in the context of prisons, where the punitive character of the environment may make even purely regulatory sanctions appear punitive in nature. The need to maintain order, however, is a legitimate nonpunitive interest, even if it sometimes requires that prison officials take action of a punitive character. As we observed in *Hernandez–Fundora:*

> Punitive interests and remedial interests ... are nowhere so tightly intertwined as in the prison setting, where the government's remedial interest is to maintain order and to prevent violent altercations among a population of criminals .... Thus, the fact that remedial concerns require "punishing" individuals for violent or other disruptive conduct does not mean that the sanctions imposed constitute "punishment" for double jeopardy purposes.

58 F.3d at 806–07. We agree with the Eleventh Circuit's observation, in analyzing a similar question, that "[p]rison officials have no authority to alter the inmates' original criminal sentences. They merely implement disciplinary proceedings that may, at most, change the conditions of the inmates' confinement for purposes of maintaining institutional order and encouraging compliance with prison rules." *Mayes,* 158 F.3d at 1224.

As noted above, the *Kennedy* factors are to be applied flexibly. *See Hudson,* 522 U.S. at 99, 118 S.Ct. 488 (*Kennedy* factors "provide useful guideposts"). Although several of the factors suggest that Porter's sanction was punitive in nature, others suggest so strongly the presence of a legitimate, nonpunitive purpose that we must conclude the sanction was civil in nature. We thus hold, consistent with our earlier analysis in *Hernandez–Fundora,* that Rule 1.00 authorizing prison disciplinary sanctions for the commission of Penal Law offenses is not "so punitive in either purpose or effect as to transform what was clearly intended as a civil remedy into a criminal penalty." *Hudson,* 522 U.S. at 99, 118 S.Ct. 488 (internal citations and quotation marks omitted; alteration in original).

The fact that Acting Captain Walter explained at the disciplinary proceeding that Porter's confinement in SHU was intended to "impress upon [Porter] the fact that conduct such as this will not be tolerated and serve as a deterrent for future misconduct" does not change the result. *See id.* at 105, 118 S.Ct. 488 (the mere fact that a civil sanction may share goals with criminal punishment does not, *a fortiori,* transform the civil sanction into criminal punishment within the meaning of double jeopardy). Nor do we find any merit in Porter's attempt to distinguish prior cases by noting that the disputed Tier III proceeding occurred *subsequent* to his conviction. If Porter's implication is that his disciplinary sanction was excessive or arbi-

trary in light of the fact that he had already been criminally punished for his act, we disagree. This case, at least, raises no such concern, because Porter's sanction was clearly related to a nonpunitive interest, and not excessive in relation to it. For all the reasons stated above, we find that the disciplinary proceeding was civil in nature and therefore presented no violation of the Double Jeopardy Clause.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.