[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-14449
_____

D.C. Docket No. 3:11-cr-0008-WKW-CSC-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

COURTNEY DAVIS WILSON,
a.k.a. Co Co,
RECO MAREESE DANIELS,
DAMIEN MICHAEL PIERCE,
a.k.a. Mike,

Defendant-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Alabama
_____

(December 16, 2015)

Before WILLIAM PRYOR, Circuit Judge, and WOOD,[*] Chief District Judge.[**]

PER CURIAM:

Defendant-Appellants Courtney Wilson, Reco Daniels, and Damien Pierce (collectively, the "Appellants") were convicted of various offenses following a joint jury trial in the Middle District of Alabama.  While the Appellants challenge their convictions and sentences on several grounds, we find only two issues worthy of discussion: (1) whether the district court erred in implementing enhanced security measures at trial; and (2) whether the district court erred in admitting the testimony of a gang expert from California.[1]  After thorough review, we agree with the district court and thus affirm.

---

[*] Honorable Lisa Godbey Wood, Chief United States District Judge for the Southern District of Georgia, sitting by designation.

[**] Honorable B. Avant Edenfield, United States District Judge for the Southern District of Georgia, sat by designation as a member of the panel at oral argument, but is now deceased.  We therefore decide this case as a quorum.  28 U.S.C. § 46(d).

[1] Wilson raises the following issues on appeal: (1) whether the district court erred in denying Wilson's Motion in Limine to exclude evidence under Federal Rule of Evidence 404(b) or, in the alternative, failing to sever the trial; (2) whether the district court erred in allowing a gang expert from California to testify; (3) whether the district court erred in ordering enhanced security measures at trial; (4) whether the district court erred in granting the prosecution's *Batson* challenge during jury selection, *Batson v. Kentucky*, 476 U.S. 79, 79, 106 S. Ct. 1712, 1712, 90 L.Ed.2d 69 (1986); (5) whether the district court erred in enhancing Wilson's sentence; and (6) whether the application of 18 U.S.C. § 922(g) was appropriate in this case.  Daniels' appeal presents the following: (1) whether the district court erred in failing to sever the trials of the defendants; (2) whether the district court erred in allowing a gang expert from California to testify; (3) whether the sentence imposed upon Daniels was greater than necessary, in violation of 18 U.S.C. § 3553(a); and (4) whether the district court erred in applying a four-level enhancement for abduction.  Finally, Pierce raises these issues: (1) whether the district court erred in denying the defense Motion for a New Trial; (2) whether the district court erred in denying the Motion for Judgment of Acquittal; (3) whether the district court erred in applying a

2

## I.  BACKGROUND

From July to October 2009, the Appellants committed a series of violent crimes throughout the Middle District of Alabama.  Specifically, on July 30, 2009, Wilson, Daniels, and two other individuals named Anthony Tallie and Valerie Long followed a vehicle to an apartment complex, attacked the owner of the vehicle—striking him with a firearm and causing serious bodily injury, seized the keys to the vehicle, and unsuccessfully attempted to steal the vehicle before fleeing the scene.  On August 1, 2009, the three Appellants went to a house, knocked on the front door, and, when the man living in the home opened the door, proceeded into the residence carrying firearms.  The Appellants beat the man, ordered his family members to lie on the floor, searched the house, and, ultimately, forced the man into the trunk of the family's vehicle and drove the vehicle off of the property. Finally, on October 23, 2009, Wilson and another individual named Willie Tallie robbed a convenience store clerk at gunpoint and, after leaving the premises, were picked up by a vehicle driven by Daniels.

A federal grand jury in the Middle District of Alabama returned an eight-count second superseding indictment on August 31, 2011, which charged the Appellants—as well as codefendants Anthony Tallie and Willie Tallie, who

four-level enhancement for abduction; and (4) whether the district court erred in considering representations made in the presentence report.

subsequently pled guilty—with various offenses relating to their involvement in the foregoing events.[2] The second superseding indictment also alleged that the Appellants were members of, or associated with, the "Cedar Block Piru" set of the "Bloods" street gang in Montgomery, Alabama.

## A. Security Measures

The district court held a pretrial status conference with counsel for all parties on March 15, 2012, at which time the prosecution raised a number of concerns about the level of security at trial. Specifically, the prosecutor informed the court that one of the Appellants had allegedly made a threat toward him and another prosecutor, but that the threat appeared to be fabricated. The prosecutor also indicated that Daniels had written a threatening letter to the family of Valerie Long, the Appellants' unindicted cooperator who had agreed to testify for the prosecution, and that Wilson and Daniels had verbally threatened Anthony Tallie,

---

[2] Wilson and Daniels were indicted on the following charges: conspiracy and aiding and abetting possession of firearms in furtherance of crimes of violence, in violation of 18 U.S.C. §§ 924(o), 2 (Count One); aiding and abetting attempted carjacking, in violation of 18 U.S.C. §§ 2119, 2 (Count Two); aiding and abetting the brandishing of a firearm in furtherance of a crime of violence (the carjacking in Count Two), in violation of 18 U.S.C. §§ 924(a)(1)(A), 2 (Count Three); aiding and abetting carjacking, in violation of 18 U.S.C. §§ 2119, 2 (Count Four); aiding and abetting the brandishing and discharging of a firearm in furtherance of a crime of violence (the carjacking in Count Four), in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii)–(iii), (c)(1)(C)(i), 2 (Count Five); aiding and abetting the interference with commerce by threats or violence, in violation of 18 U.S.C. §§ 1951(a), 2 (Count Six); and aiding and abetting the brandishing of a firearm in furtherance of a crime of violence (the robbery in Count Six), in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii), (c)(1)(C)(i), 2 (Count Seven). Pierce was charged with Counts One, Four, and Five. Wilson was also indicted for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) (Count Eight), but this charge was dismissed before trial.

another potential cooperating witness.  Further, the prosecutor expressed concerns regarding the audience at trial and the ability to control the atmosphere in and around courtroom, based on the fact that the Appellants' family members would be present at trial while the prosecution's witnesses—particularly the victims and the Appellants' cooperators—would be testifying against the Appellants.  On the basis of this information, the court instructed the prosecution to continue to communicate with the U.S. Marshals Service and the court regarding these security matters, and to follow up with court staff concerning a request for specifically identified witness rooms.

At another status conference on March 27, 2012, the district judge notified counsel that he had met with the U.S. Marshals on multiple occasions to discuss "a lot of security issues and other types of issues surrounding this case."  The judge referenced, in particular, his concern over the presence of the Appellants' family members at trial, alongside family members of the witnesses who would be testifying against the Appellants.

Accordingly, the judge announced that he intended to enter an order providing for additional security measures at trial, and described the general content of that order.  For example, the district judge stated that the Appellants would wear shackles on their legs for the duration of trial, but that certain precautionary measures would be in place:

5

We're also going to have skirts on the table so that the leg chains --
and the leg chains are going to be taped so they don't rattle. And so
we're going to keep that as much as possible from the jury. The
defendants will be in leg chains only. And . . . the [court security
officers] and the [M]arshals know to move -- only move the jury in
when the defendants are seated at counsel table behind the skirts.

The judge also indicated that the Appellants would wear electronic devices, or

tasers, on their legs and potentially on their arms, which would "need to be under

clothing so they[ ] [would] not [be] seen." Additionally, the judge stated that

"[t]he first row of the seating in the gallery [would] . . . be reserved for law

enforcement." Finally, there would be an additional metal detector, or some other

form of screening, outside the door through which the trial participants and

spectators would be entering the courtroom.[3]

Wilson's counsel voiced concern about the effect of these security measures

on his client's right to a fair trial, and, at the judge's direction, filed a Motion in

Limine on March 29, 2012, addressing this issue and making an additional

argument regarding due process rights. Nevertheless, the district court entered its

order on security measures later that day, which largely echoed the judge's

statements made on the record at the status conference. One notable addition to the

---

[3] The district judge also mentioned other security measures, none of which form the basis of this appeal, including the following: all trial participants and spectators would enter and exit the courthouse complex through one annex entrance; certain articles of clothing and accessories would be prohibited; any person unable to enter the courtroom once it reached capacity would need to leave the courthouse complex, rather than loiter in or around the courthouse; spectators would not be able to enter or exit the courtroom after the proceedings commenced, except during official breaks; and the court would empanel an anonymous jury.

judge's instructions, however, clarified that "[a]ll counsel tables [would] be skirted," not just the defense table.[4]

Prior to jury selection on the morning of March 30, 2012, Wilson's counsel called the court's attention to the pending Motion in Limine. At that time, counsel for Daniels and Pierce, on behalf of their clients, joined in the objections raised in Wilson's Motion in Limine. The court noted these motions and offered counsel an opportunity to voice any further opposition to the security measures before the jury entered.

---

[4] The March 29, 2012, order states:
1. All trial participants (except United States Attorney staff) and spectators will only enter and exit the courthouse complex through the Annex entrance on Church Street.
2. Appropriate clothing will be required to preserve decorum and enhance security. Baseball and other hats, headbands, and any article of clothing or accessory indicative of possible gang affiliation are prohibited. Buttons, signs or other articles disruptive to the proceedings are also prohibited.
3. The first row of seating in the gallery of the courtroom is reserved for law enforcement only.
4. The second row of seating on the government side of the gallery is reserved for the media.
5. Once the courtroom gallery has filled to capacity, those persons unable to enter must leave the courthouse. There will be no loitering in or around the courthouse complex.
6. Spectators will not be allowed to enter or exit the courtroom once the proceedings have begun except during official breaks or with the consent of security personnel.
7. Any spectator attempting to communicate with or intimidate any trial participant or juror will be immediately removed by the United States Marshal. The spectator may be subject to contempt of court or criminal charges for any attempt to communicate with or intimidate any trial participant or juror.
8. All counsel tables will be skirted. No Defendant will be moved in or out of the courtroom while the jury is present. Shackle chains are to be taped for sound proofing.

Ultimately, however, the judge determined that the security measures would remain in place, stating, "[F]or security reasons that you-all are not aware of, we are going to leave the security measures that I've ordered in place. There's a good reason for them." Rather than detail his reasoning at that time, the judge advised counsel, "we're going to take that up after we strike the jury today. . . . I'm going to put on the record, insofar as I can, what those matters are."

The district judge assured counsel that the court had taken their concerns into account and had "taken up every reasonable precaution." Specifically, the judge reminded counsel that additional safeguards were in place, such as the skirting of the tables, taping of the leg chains, and moving of the Appellants outside the presence of the jury. Additionally, the judge noted, "All security [officers] in the room [are] nonuniformed. All security [officers] are in business suits, including the marshals and [court security officers]." The judge further remarked, before moving forward to jury selection, "The jurors are not going to be put through metal detectors. . . . If you're worried about jurors, they don't know anything about extra metal detectors. For all they know, this is how we normally do business around here."

Following the jury-selection proceeding, the court returned to the trial-security discussion in a separate proceeding held before the start of trial on April 2, 2012. The transcript of this proceeding remains under seal. The docket, however,

8

reflects that the district judge orally denied the Appellants' motions in limine, and, therefore, the court employed the prescribed security measures at trial.

## B. Witnesses

The prosecution's witness list included the Appellants' codefendants, Anthony Tallie and Willie Tallie, who had pled guilty and agreed to testify against them. The witnesses testified that they were cousins, and that Daniels was also their cousin, while Wilson was a longtime friend. Anthony Tallie also gave an account of his participation in the July 30, 2009, attempted carjacking along with Wilson, Daniels, and Valerie Long. Willie Tallie described his involvement in robbing the convenience store with Wilson and being picked up by Daniels on October 23, 2009.

More importantly, Anthony Tallie stated that Wilson, Daniels, Willie Tallie, and Valerie Long were members of the Blood street gang. While Anthony Tallie maintained that he was never "beat in" (or given full membership) to the gang, he admitted that he had tried to fit in with the gang when he was younger by wearing a red shirt and red hat. When asked how he knew that Daniels, in particular, was a Blood, he said that Daniels wore red, carried a gun, and used Blood slang— including substituting "B" for "C," such as "bountry" instead of "country"— particularly in conversations with Wilson. According to Anthony Tallie, Daniels had attained the status of "triple OG" in the gang, and Wilson the status of "OG" or

9

"double OG," based on their time in the gang and having "put in work" for the gang.  Such terms were further defined by Willie Tallie.

Willie Tallie confirmed, upon taking the stand, that he was a member of the Cedar Block set of the Blood gang, along with Wilson and Daniels.  He recalled that he was beat in to the gang by Wilson, who had already been a member, on Collinwood street.  Willie Tallie noted, however, that in Blood lingo, "Collinwood" was pronounced "Bollinwood"—replacing the "C" with a "B," or otherwise placing an "X" through the "C," so as to avoid using the letter of the Bloods' rival gang, the Crips.

Additionally, Willie Tallie explained that upon joining the Bloods, new members were taught "knowledge" of the gang by their "OG," including the gang's signs, the importance of certain items and the color red, and the gang's origins in California before spreading to other locations such as Montgomery, Alabama.  He stated that "knowledge" also included terminology, such as the word "Piru" and the practice of replacing "C" with "B," and hand signs.  New members also learned the ranks within the gang: "OG," or "original gangster"—the rank held by Wilson and Daniels, according to Willie Tallie—as well as "BG" and "YG."[5]  Willie Tallie explained that gang members could move up the ranks by putting in work, or, in other words, going on missions, such as a shooting mission,

_____

[5] Willie Tallie indicated that he was uncertain as to what "BG" and "YG" signified.

10

breaking-and-entering mission, or fighting mission.  He further testified that he had used the term "Piru" and other gang terminology in conversations with Wilson and Daniels, and that the three had worn red to signify the Bloods, used hand signs, carried firearms every day, and engaged in criminal activity together.

Other witnesses for the prosecution included three victims of the home invasion on August 1, 2009.  Particularly relevant here is that in describing the events that transpired on that evening, the man who lived in the home remarked that one of the perpetrators was wearing a red hat displaying the iconic "P" of the Philadelphia Phillies professional baseball team, another was wearing tennis shoes with red laces, and at least two were carrying firearms.  The man's two family members also testified to having heard the perpetrators shout the word "Piru" repeatedly, and one confirmed that one of the perpetrators had worn a red hat.

## C.  Gang Experts

Prior to trial, the prosecution gave notice to the Appellants that it intended to offer the expert testimony of Detective Wayne Joseph Caffey ("Detective Caffey") of the Los Angeles Police Department (the "LAPD") in Los Angeles, California. The prosecution informed the Appellants that Detective Caffey was prepared to testify regarding the Appellants' affiliation with the Blood street gang.

Wilson timely filed a Motion to Limine seeking to exclude Detective Caffey's testimony as unreliable and improper under Federal Rules of Evidence

11

702 and 704, as well as *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993). Pierce and Daniels subsequently moved in limine, adopting Wilson's arguments and further objecting to this testimony as unfairly prejudicial, misleading, and confusing under Federal Rule of Evidence 403. In opposition to these motions, the prosecution filed a Response emphasizing Detective Caffey's extensive experience working with gangs, and that his testimony would serve a critical role in explaining the other evidence of the Appellants' gang affiliation at trial.

The district court noted the Appellants' motions, and their request for a *Daubert* hearing on the matter, at the March 15, 2012, status conference. Upon the court's inquiry, the prosecutor briefly set forth Detective Caffey's background, including that he had over thirty years of experience with the LAPD working directly with gang members. The prosecutor described the general nature of the expert's testimony as follows:

> One thing in particular that he will talk about is that the Bloods street gang began in Compton, California. One of the original sets was called Piru, based off the name of Piru Street in Compton, California. Over time, the Bloods street gang has sort of been exported to all parts of the country, okay; and gang members throughout other parts of the country have adopted many of these -- obviously, the colors, the lingo, and that sort of thing.

As to his opinion of the specific facts of this case, the prosecutor represented that Detective Caffey's statement would be limited to whether, "based on the

12

evidence [he had] reviewed in this case"—including the testimonies of the victims of the home invasion—he believed that the Appellants had "exhibit[ed] conduct consistent with Blood gang members or membership in the Bloods street gang." The prosecutor assured the court that he "[did not] plan to have him say these three individuals were Bloods."[6]

Based on these representations, the district court found no reason to hold a pretrial *Daubert* hearing regarding Detective Caffey's testimony, but expressly left open the possibility of an intratrial hearing on the matter. Nevertheless, the district judge later informed counsel at the jury-selection proceeding that he planned to allow expert gang testimony from both sides, and, accordingly, orally denied the Appellants' motions in limine regarding Detective Caffey's testimony before the start of trial on April 2, 2012. In doing so, however, the judge chose to reserve ruling on the scope of the testimony until it was presented at trial.

The Appellants renewed their objections to Detective Caffey's testimony at trial, citing their previously stated grounds. The district judge overruled these objections, allowing Detective Caffey to take the stand.

Detective Caffey testified at great length regarding not only his experience with California gangs but also his gang-related experience in other parts of the

---

[6] The prosecution provided the court with a copy of a "lengthy letter" originally sent to defense counsel, which laid out the expert disclosure for Detective Caffey and the nature and scope of the matters about which he would testify.

country.  At the time of trial, Detective Caffey had over thirty years' experience as a member of the LAPD.  He had completed four different assignments with a unit of the LAPD specifically dedicated to street-gang activity, though he testified that most of his assignments with other units—such as homicide or narcotics—had involved gang members.[7]  Through these assignments, Detective Caffey had frequent contact with gang members and interviewed them on several occasions—both on the street and at the jail, and some for identification purposes.

Detective Caffey further stated that he had worked with the gang intel and surveillance unit of the LAPD for fourteen years.  During that time, Detective Caffey worked with the California prison system to identify and interview gang members for intelligence, crime-solving, or other purposes.  Detective Caffey maintained that, between the streets and the jails, he had interviewed approximately four thousand gang members, about thirty percent of whom were members of the Blood gang.

In addition to his assignments, Detective Caffey testified that he had received specialized training on street gangs from the LAPD.  He also had directed an in-service class for the LAPD on African-American street and prison gangs for over twenty years, and taught an interview class for advanced investigators for the State of California.  Detective Caffey further testified that he had been a member

---

[7] Detective Caffey estimated that he had investigated over two hundred gang-related homicides in his career.

14

of the California Gang Investigators Association for over twenty years, which provided unique opportunities to network with other gang officers both in California and nationwide.

Detective Caffey explained that the Los Angeles gang culture had spread all over the country, and, consequently, he was periodically asked to attend national gang conferences to instruct governmental and civilian audiences on the subject of gang history and practices.[8]  He also stated that he had provided gang training to federal law enforcement officers, federal judges, teachers, social workers, and church groups, among others.  At one training course in Florida in particular, Detective Caffey had the opportunity to speak with several members of the east-coast Bloods and Crips, who shared with him information about their gangs and their experiences.  Detective Caffey estimated that he provided training or taught courses on gangs about ten to fifteen times per year and had trained well over twenty thousand people on gang activity.

Among Detective Caffey's other accomplishments were the following: writing an article on the history of the Blood and Crip gangs, which was published in a number of periodicals; consulting with television programs and news agencies in the Los Angeles area; and participating in a *National Geographic* segment on the history of the Bloods and Crips.  He also testified as a gang expert in California

---

[8] Detective Caffey specified that he had attended gang conferences in Florida, Maryland, Illinois, Arizona, and New Mexico, among several other states.

15

state court over two hundred times, and in three federal cases in Nashville, Tennessee.

After discussing his qualifications, Detective Caffey detailed the origin, traditions, and growth of the Blood gang. He stated that the Blood gang was comprised of many subsets, including the "Cedar Block Piru" set, named after the streets or areas of Compton, California, where the gang originated. The Blood gang eventually spread to other parts of California and the country, retaining, all the while, several of the traditions of the original Blood gang. According to Detective Caffey, these traditions were indicators of membership in the Blood gang, and included wearing the color red, clothing displaying the letters "B" for "Blood" or "P" for "Piru," clothing of sports teams with these letters (such as the Boston Red Sox, Chicago Bulls, and Philadelphia Phillies), and a red bandana. He also related that Blood gang members uniformly viewed Crip gang members as enemies.

Other traditional indicators of Blood gang membership, according to Detective Caffey, were the use of certain terminology, such as "Piru" (understood as being synonymous with "Blood") and "damu" (Swahili for "Blood"). Blood gang members also replaced the letter "C" with a "B" when speaking with other Bloods (such as "Bompton" rather than "Compton"); crossed out, flipped upside down, or flipped backward the letter "C" when written; and made certain hand

16

signs displaying the letter "B" or "P." Detective Caffey further testified that Blood gangs nationwide generally committed violent crimes and carried firearms.

Notwithstanding these similarities, Detective Caffey identified some distinctions between the west-coast and east-coast Bloods. For example, he explained that individuals joining the Blood gang typically were grandfathered in or recruited, but that the recruitment techniques differed, depending on location, from being "jumped in" (or taking "a beat[ ] down") to "putting in work" (or carrying out missions, often violent, to earn respect). Detective Caffey also indicated that while Blood gangs nationwide used the designation "OG," or "original gangster," the methods of achieving this status, as well as the level of prestige afforded to it, varied from coast to coast. In addition to "OG," east-coast Bloods recognized other titles—"double OG," "triple OG," "YG" ("young gangster"), and "BG" ("baby gangster")—forming a rank structure that was not characteristic of the original west-coast Blood gang. Finally, Detective Caffey stated that he had encountered east-coast Blood gang members with certain tattoos that were not common among Bloods on the west coast, and had observed east-coast Bloods using numbers to communicate in a code-like fashion not shared by their west-coast counterparts.

When asked about his familiarity with the Appellants' case, Detective Caffey shared that he had reviewed some recordings, reports, transcripts of

17

recordings, and photographs of the Appellants. Detective Caffey commented on those photographs, which the prosecution had entered into evidence, including his interpretations of certain of the Appellants' tattoos and his observations of their red clothing, hats embroidered with the letter "B," and hand signs.[9] Additionally, he offered his opinion on recordings and transcripts of recordings entered into evidence by the prosecution, which captured certain of the Appellants' telephone conversations while incarcerated. Detective Caffey noted, in part, that the speakers consistently replaced "C" with "B"; used numbers to communicate; repeated "damu" and "Piru" multiple times; self-identified as an "OG"; spoke negatively about Crips; and, on one occasion, described an area of Compton that was Cedar Block Piru territory.[10]

Detective Caffey also commented on the statements of one of the home invasion victims, the transcript and audio of which he had reviewed prior to taking the stand. He found certain facts relayed by the victim to be particularly noteworthy: that the perpetrators wore red hats, one of which displayed the iconic "P" of the Philadelphia Phillies; that they repeatedly shouted the word "Piru"; and

---

[9] For instance, in one photograph featuring Daniels, Detective Caffey opined that his tattoo "CBP" meant "Cedar Block Piru," and observed that the "C" was crossed out. Detective Caffey also remarked that the inscription "Bollinwood" underneath "CBP" appeared to refer to the specific Blood area in this case, which he understood to be "Collinwood," with the "C" characteristically changed to a "B."

[10] In particular, the speakers said, "bity," "brazy," and "Bhristmas," instead of "city," "crazy," and "Christmas," respectively.

18

that these things occurred while the Appellants were in a house committing a crime. The prosecutor's inquiry into Detective Caffey's opinion of these facts proceeded as follows:

> Q.    If you didn't know anything about the facts of this case and with no knowledge of who actually committed that particular crime, if you reviewed those statements from that victim, what would be your perception of that incident?
>
> A.    As an investigator, the first thing I would be looking for were Blood gang members.
>
> Q.    And would being in a house while committing a crime, shouting the term "Piru" -- is that conduct that's consistent with what you've seen in your experience among Blood gang members?
>
> A.    Yes.
>
> Q.    And if an individual is wearing a Phillies hat in that house, is that significant to you?
>
> A.    Yes.

Detective Caffey further stated that it would have been unusual for Blood gang members to bring a nonmember of the gang with them to commit a crime such as the home invasion robbery. Notwithstanding these statements, Detective Caffey represented on cross-examination that he had no personal knowledge as to whether any one of the Appellants was, in fact, a member of a gang.

Later in the trial, Pierce called his own gang expert, Lisa Taylor-Austin ("Taylor-Austin"), to testify. Taylor-Austin stated that she held a counseling degree and had experience counseling approximately two thousand gang members

19

throughout California, New York, and Connecticut. She also indicated that she had consulted with two collegiate institutions, a television show, the New York Police Department gang unit, and a U.S. Marshals office in Louisiana regarding gang activity. Further, Taylor-Austin reported that she had completed training or taught courses on gangs in California and the northeast, and served as a gang expert in Arizona, Kansas, Kentucky, and South Carolina.

Consistent with Detective Caffey's testimony, Taylor-Austin described gang identifiers as including clothing in one primary color; symbols on clothing; tattoos; hand signs; specific terminology, such as numeric codes and, in the case of Bloods, the word "Piru"; and the commission of crimes. Taylor-Austin, like Detective Caffey, stated that her knowledge of the Appellants' case was limited to what she had heard in court, and her review of some of the relevant transcripts and other statements in the case. On this evidence, Taylor-Austin concluded that the evidence seemed to support the existence of a hybrid gang, given the mixed references to "Cedar Block Piru," "Bollinwood," and other names.[11]

## D.  Verdict and Sentencing

---

[11]  Taylor-Austin's testimony was slightly inconsistent with that of Detective Caffey in some other respects—none of which is of any consequence here—such as her statement that the east-coast designations of "double OG" and the like were prevalent but did not function as a rank structure, and her interpretations of the hand signs in the photographs as representing a gang, but not the Blood gang.

20

On April 6, 2012, the jury returned verdicts finding the Appellants guilty on all charged counts.  The district court sentenced Wilson to a term of 894 months in prison, Daniels to a term of 1,044 months in prison, and Pierce to a term of 288 months in prison.  Additionally, the court sentenced each Appellant to five years of supervised release following the term of imprisonment, as well as a special assessment.  Wilson, Daniels, and Pierce timely filed their respective notices of appeal on August 27, 2012, September 5, 2012, and October 1, 2012.

## II.  LEGAL STANDARDS

The first issue we address is whether the district court erred in ordering the use of enhanced security measures at trial.  We review for abuse of discretion a district court's decision regarding the security measures that will be in place at trial.  *United States v. Baker*, 432 F.3d 1189, 1245 (11th Cir. 2005); *United States v. Durham*, 287 F.3d 1297, 1304 (11th Cir. 2002).  District judges are ultimately responsible for "ensuring the safe, reasonable and orderly progress of trial." *Durham*, 287 F.3d at 1303 (internal quotation marks omitted) (quoting *United States v. Theriault*, 531 F.2d 281, 284 (5th Cir. 1976)).[12]  Accordingly, a district judge must be afforded reasonable discretion to balance the interests involved and to determine the measures necessary to guarantee the security of the courtroom.

---

[12]  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as precedent all of the former Fifth Circuit decisions prior to September 30, 1981.

*Id.* (citing *Theriault*, 531 F.2d at 284); *United States v. Mayes*, 158 F.3d 1215, 1219 (11th Cir. 1998).

The second issue that merits discussion is whether the district court erred in allowing the prosecution's gang expert to testify at trial. We review a district court's evidentiary rulings, including those regarding the admissibility of expert testimony and reliability of expert opinion, for an abuse of discretion. *United States v. Augustin*, 661 F.3d 1105, 1123 (11th Cir. 2011) (citing *United States v. Bradley*, 644 F.3d 1213, 1270 (11th Cir. 2011)); *United States v. Frazier*, 387 F.3d 1244, 1258 (11th Cir. 2004) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141–43, 118 S. Ct. 512, 517, 139 L.Ed.2d 508 (1997)). Indeed, a district court enjoys "considerable leeway" in making decisions of this type, as it is in the best position to evaluate documentary evidence and is able to observe witnesses and jurors first hand. *United States v. Brown*, 415 F.3d 1257, 1265–66 (11th Cir. 2005) (citing *United States v. Jernigan*, 341 F.3d 1273, 1285 (11th Cir.2003)) ("We recognize a significant range of choice for the district court on evidentiary issues, which is to say we defer to its decisions to a considerable extent." (citing *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002))).

When applying the abuse-of-discretion standard, we must affirm unless we find that the district court has applied the wrong legal standard, followed the wrong procedure, relied on clearly erroneous facts, or committed a clear error of

22

judgment. *See Baker*, 432 F.3d at 1245 (citing *Frazier*, 387 F.3d at 1259) (security measures); *Brown*, 415 F.3d at 1266 (citing *McClain v. Metabolife Int'l Inc.*, 401 F.3d 1233, 1238 (11th Cir. 2005); and *Frazier*, 387 F.3d at 1259) (expert testimony).

## III.  DISCUSSION

### A.  Security Measures

Wilson argues that the district court erred in issuing an order directing the use of additional security measures at trial.  Specifically, the Appellant maintains that the following security measures interfered with his constitutional rights to a fair trial and to due process of law: (1) the requirement that the Appellants wear shackles and tasers for the duration of trial; (2) the presence of additional U.S. Marshals and court security officers in the courtroom, for whom the court reserved the first row of the gallery; and (3) the placement of an additional metal detector outside the courtroom door.  According to Wilson, he suffered actual prejudice as a result of these measures, in that "the jury was predisposed to find him guilty because of the intense security that was presen[t]."  Wilson further contends that these measures posed an inherent risk of prejudice based on "the unacceptable risk of the tightened security coming into play."

While a district court retains reasonable discretion to determine which security measures are necessary in a given case, this discretion is necessarily

23

limited by a criminal defendant's constitutional rights to a fair trial and due process of law. *See Durham*, 287 F.3d at 1304–06 (citing *Theriault*, 531 F.2d at 284). Among the fair-trial and due-process interests often implicated by security measures are the presumption of innocence until proven guilty, the right to secure a meaningful defense, the right to be present at trial and participate in one's defense, and "the need to maintain a judicial process that is not an affront to the dignity and decorum of the proceeding itself." *See id.* (citing *Estelle v. Williams*, 425 U.S. 501, 503, 96 S. Ct. 1691, 48 L.Ed.2d 126 (1976), and *Zygadlo v. Wainwright*, 720 F.2d 1221, 1223 (11th Cir. 1983)); *see also Baker*, 432 F.3d at 1244 (citing *Deck v. Missouri*, 544 U.S. 622, 630–31, 125 S. Ct. 2007, 2013, 161 L.Ed.2d 953 (2005), and *Mayes*, 158 F.3d at 1225). Integral to the presumption of innocence, a criminal defendant must be tried by an impartial, indifferent jury, *Woods v. Duggar*, 923 F.2d 1454, 1456 (11th Cir. 1991), and his guilt or innocence must be decided solely on the basis of evidence developed at trial, rather than "other circumstances not adduced as proof at trial," *Holbrook v. Flynn*, 475 U.S. 560, 567, 106 S. Ct. 1340, 1345, 89 L.Ed.2d 525 (1986) (quoting *Taylor v. Kentucky*, 436 U.S. 478, 485, 98 S. Ct. 1930, 1934, 56 L.Ed.2d 468 (1978)).

To safeguard these rights, a district court must be alert to factors that may undermine the fair trial process. *Estelle*, 425 U.S. at 503, 96 S. Ct. at 1693; *Woods*, 923 F.2d at 1456. Specifically, a court "must guard against 'the

atmosphere in and around the courtroom [becoming] so hostile as to interfere with the trial process.'" *Woods*, 923 F.2d at 1456 (alteration in original) (quoting *Estes v. Texas*, 381 U.S. 532, 552, 85 S. Ct. 1628, 1637, 14 L.Ed.2d 543 (1965) (Warren, C.J., concurring)).  A district court, therefore, must closely scrutinize any practice affecting the trial process, evaluating its likely impact on the judgment of jurors based on "reason, principle, and common human experience." *Estelle*, 425 U.S. at 504, 96 S. Ct. at 1693.

To prevail on a claim of being denied a fair trial based on a district court's decision to implement a particular practice, a criminal defendant must demonstrate either actual or inherent prejudice. *Woods*, 923 F.2d at 1457 (citing *Holbrook*, 475 U.S. at 560, 106 S. Ct. at 1340, and *Irvin v. Dowd*, 366 U.S. 717, 81 S. Ct. 1639, 6 L.Ed.2d 751 (1961)).  With regard to inherent prejudice, the test is "not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether 'an unacceptable risk is presented of impermissible factors coming into play.'" *Id.* (citing *Holbrook*, 475 U.S. at 570, 106 S. Ct. at 1346).  Thus, the test for inherent prejudice requires us to consider (1) "whether there is an 'impermissible factor coming into play,'" and (2) "whether it poses an 'unacceptable risk.'"  *Id.*  Where a criminal defendant succeeds in proving actual or inherent prejudice due to the use of a particular procedure at trial, the state must

justify such procedure with an "essential state interest specific to [the] trial." *Id.* (citing *Holbrook*, 475 U.S. at 569, 106 S. Ct. at 1346).

We have long held that physical restraints upon a defendant "should be used as rarely as possible" as a courtroom security measure at trial, given their tendency to disrupt a criminal defendant's constitutionally guaranteed rights. *Durham*, 287 F.3d at 1304–05 (citing *Allen v. Montgomery*, 728 F.2d 1409, 1413 (11th Cir. 1984), and *Zygadlo*, 720 F.2d at 1223). Physical restraints, such as shackles and tasers, tend to erode a defendant's right to a presumption of innocence, as well as his rights to confer with counsel, be present at trial, and participate in his defense. *See id.* (citing *Mayes*, 158 F.3d at 1225, and *Zygadlo*, 720 F.2d at 1223). Even so, we have found that it may be appropriate to use these restraints in certain circumstances to ensure the safe and orderly progress of trial. *Id.* at 1303 (quoting *Theriault*, 531 F.2d at 284).

Before a district court may order the use of shackles or a taser as a security measure at trial, the court must make a case-specific, individualized assessment of each defendant in the particular trial. *Baker*, 432 F.3d at 1244 (citing *Deck*, 544 U.S. at 633, 125 S. Ct. at 2015). This assessment may involve the following considerations, among others:

> the criminal history and background of each of the defendants, including whether the defendant has a history of violent acts; the number of defendants being tried together; the nature of the charges pending against the defendant, including whether the charged offenses

26

include violent criminal conduct; any past history of conduct by a defendant that may have disrupted a criminal proceeding; and other circumstances, such as threatening behavior against witnesses or court personnel, that may reasonably bear upon the safety of the courtroom and its occupants or upon the danger of escape.

*Id.* If a district court intends to require a defendant to wear a physical restraint at trial, the court must state its reasons for doing so on the record. *Durham*, 287 F.3d at 1304 (citing *Theriault*, 531 F.2d at 285).

In reviewing a district court's decision to implement physical restraints for an abuse of discretion, our inquiry is twofold. First, we consider whether "there was an essential state interest furthered by compelling a defendant to wear shackles" or a taser. *Id.* (quoting *Elledge v. Dugger*, 823 F.2d 1439, 1451 (11th Cir. 1987) (per curiam)). Second, we look to whether "less restrictive, less prejudicial methods of restraint were considered or could have been employed." *Id.* (quoting *Elledge*, 823 F.2d at 1451); *see also id.* at 1306 & n.8 (stating that the record must also contain the district court's factual findings regarding the basic operation of an electronic device, such as a taser, but only if the defendant raised a factual question as to the device's functionality).

By contrast, the Supreme Court has determined that the presence of uniformed security officers in the courtroom as a security measure at trial is not the sort of inherently prejudicial procedure that must be supported by an essential state

interest specific to the trial. *Holbrook*, 475 U.S. at 568–69, 106 S. Ct. at 1345–46.

As the Supreme Court explained,

> [t]he chief feature that distinguishes the use of identifiable security
> officers from courtroom practices we might find inherently prejudicial
> is the wider range of inferences that a juror might reasonably draw
> from the officers' presence.  While shackling and prison clothes are
> unmistakable indications of the need to separate a defendant from the
> community at large, the presence of guards at a defendant's trial need
> not be interpreted as a sign that he is particularly dangerous or
> culpable.  Jurors may just as easily believe that the officers are there
> to guard against disruptions emanating from outside the courtroom or
> to ensure that tense courtroom exchanges do not erupt into violence.
> Indeed, it is entirely possible that jurors will not infer anything at all
> from the presence of the guards.  If they are placed at some distance
> from the accused, security officers may well be perceived more as
> elements of an impressive drama than as reminders of the defendant's
> special status.  Our society has become inured to the presence of
> armed guards in most public places; they are doubtless taken for
> granted so long as their numbers or weaponry do not suggest
> particular official concern or alarm.

*Id.* at 569, 106 S. Ct. at 1346 (citing *Hardee v. Kuhlman*, 581 F.2d 330, 332 (2d

Cir. 1978)).  Thus, we must determine prejudice resulting from the presence of law

enforcement officers on a case-by-case basis.  *Id.*

The district court in this case mandated, in part, that the Appellants wear

shackles and tasers under their clothing at trial; that additional law enforcement

personnel be present at trial and seated in the first row of the gallery; and that all

trial attendees, other than the jurors, pass through an additional metal detector prior

to entering the courtroom.  However, the court did so only after the prosecution

made a proffer concerning several security issues at the March 15, 2012, status

28

conference, including threats to the prosecutors, threats to two cooperating witnesses, and the fact that the Appellants' family members would be attending trial and could become aggravated upon hearing the testimonies of the victims and coconspirators. The district judge later stated on the record at the March 27, 2012, status conference that he had met with the U.S. Marshals several times to discuss "a lot of security issues," and that he was especially concerned about the Appellants' family members being in the courtroom with the families of the witnesses testifying against the Appellants.

It was against this backdrop that the district judge informed counsel at the status conference of his intention to enter an order regarding security measures, and proceeded to detail the contents of that order. Although the district court went so far as to hold a separate sealed proceeding on April 2, 2012, to formally place the reasons for the security measures on the record, we find that the district judge had adequately stated these reasons on the record at the March 27, 2012, status conference and reiterated the same at jury selection on March 30, 2012.

Indeed, the district judge made a case-specific assessment of the Appellants at the status conference, in stating that he had met with the U.S. Marshals on multiple occasions to discuss the prevailing security issues in this case, and found it particularly concerning that the Appellants' family members would be present at trial in close proximity to the family members of the victims and cooperators

29

testifying against the Appellants. *See Baker*, 432 F.3d at 1244 (stating that a court may consider "circumstances . . . that may reasonably bear upon the safety of the courtroom and its occupants or upon the danger of escape"). While the district judge specifically mentioned having considered only this portion of the proffer given at the previous status conference, the judge's general reference to the many security issues in the case could reasonably be viewed as incorporating the rest of the proffered information—namely, the threats allegedly made toward the prosecutors and two witnesses. *See id.* (listing relevant considerations as including "any past history of conduct by a defendant that may have disrupted a criminal proceeding," as well as "other circumstances, such as threatening behavior against witnesses or court personnel"). Even assuming that the district judge had considered only the information regarding the likelihood of tension among audience members at trial, the record reflects that the judge had met and discussed this concern with counsel and the U.S. Marshals many times. Under these circumstances, we find that the judge's consideration of this matter on the record was, indeed, a case-specific assessment.

Although the district judge's reasoning on the record related to the Appellants at large, rather than to Wilson, Daniels, and Pierce individually, we have found that the failure to make express defendant-by-defendant findings in ordering the use of physical restraints does not necessarily amount to an abuse of

30

discretion.  *See id.* at 1245.  This is particularly true where the indicted charges were violent; there were multiple defendants on trial; the defendants had a full opportunity to respond to the court's security concerns and propose alternative measures; and there is no record evidence that the jury could see the physical restraints.  *See id.*; *see also Wilson v. United States*, 505 F. App'x 884, 887–88 (11th Cir. 2013).  It is undisputed that the Appellants were indicted for violent crimes; their counsel responded and raised objections to the security issues, both in writing and at the pretrial status conferences; and nothing in the record suggests that their shackles and tasers were visible to the jury.  As such, we cannot find that the district judge's assessment of the facts of this particular case was insufficient on this basis.

Rather, we find that the district judge's evaluation of this case supported employing physical restraints to further an essential state interest.  *See Durham*, 287 F.3d at 1304 (quoting *Elledge*, 823 F.2d at 1451) (requiring that a district court's decision to compel a defendant to wear physical restraints be supported by an essential state interest).  Notably, the district judge identified this interest on the record at both the March 27, 2012, status conference and the jury-selection proceeding, explaining that the measures were put into place for security purposes. *See Deck*, 544 U.S. at 628, 125 S. Ct. at 2012 (stating that an essential state interest may include ensuring physical security, preventing escape, or maintaining

31

courtroom decorum); *see also Mayes*, 158 F.3d at 1225 ("Courtroom security is a competing interest that may, at times, 'outweigh[ ] a defendant's right to stand trial before the jury untainted by physical reminders of his status as an accused.'" (alteration in original) (quoting *Allen*, 728 F.2d at 1413)).  Given that this case involved violent gang-related charges against multiple defendants, threats against the prosecutors and witnesses that were never proven to be unfounded or untrue, and many trial attendees strongly siding with either the Appellants or the witnesses testifying against them, the district court had a legitimate interest in ensuring the physical security of counsel, witnesses, spectators, and all others who would be present at trial.

Moreover, the court gave counsel multiple opportunities to object to the security practices and, ultimately, ordered that the physical restraints be accompanied by certain precautionary measures designed to minimize the risk of prejudice to Appellants.  *Durham*, 287 F.3d at 1304 (quoting *Elledge*, 823 F.2d at 1451) (requiring that a district court have considered or have employed less restrictive, less prejudicial methods of physical restraint).  In particular, the district court directed that the shackles and tasers be worn under the Appellants' clothing, the counsel tables skirted, and the shackles taped to the Appellants' legs, to prevent the jury from seeing or hearing the restraints.  In doing so, the district court employed the least restrictive and least prejudicial means of restraint available,

32

thus fulfilling the procedural prerequisites to utilizing this type of security measure. *See Mayes*, 158 F.3d at 1226 ("[W]e find no abuse of discretion in the district court's decision that shackling was appropriate during the course of the appellants' trial and that leg irons were the least restrictive method of effective restraint."); *cf. Deck*, 544 U.S. at 634–35, 125 S. Ct. at 2015 (finding that the lower court erred in requiring shackling of the defendant, in part because the court failed to explain "why, if shackles were necessary, [it] chose not to provide for shackles that the jury could not see").

Even assuming, *arguendo*, that the district court abused its discretion in instituting physical restraints, such error would not be sufficiently prejudicial as to warrant a reversal of the Appellants' convictions. Indeed, because the Appellants' clothing and the table skirts covered the shackles and tasers, and the shackle chains were taped to the Appellants' legs, the jury could neither see nor hear the restraints. Thus, the presence of the physical restraints could not have affected the juror's attitudes or their presumption of the Appellants' innocence, such that they could be considered "inherently prejudicial" in any way. *See Durham*, 287 F.3d at 1305 ("One of the most prominent concerns about the use of most methods of restraint comes from the possibility of prejudice to the defendant if those restraints are <u>visible</u> to the jury." (emphasis added) (citing *Elledge*, 823 F.2d at 1454 (Edmondson, J., concurring))); *Mayes*, 158 F.3d at 1226–27 (finding that shackling

33

was not prejudicial where the district court required the use of tablecloths to screen the appellants' legs from jury view and padding of the chains to muffle any sounds). Nor is there any evidence that the use of these restraints actually impaired the Appellants' ability to consult with their counsel and participate in their defense. Absent any indication that the presence of the shackles and tasers contributed in any way to the verdict obtained, any error on the part of the district court in ordering these restraints as a security measure would be harmless beyond a reasonable doubt.

Appellants also fail to demonstrate any prejudice resulting from the presence of additional law enforcement personnel and an additional metal detector at trial. The district court directed the additional law enforcement officers to be in plain clothes, and nothing in the record indicates that the jury was aware that these spectators were officers or otherwise perceived a hostile atmosphere in the courtroom. *Cf. Holbrook*, 475 U.S. at 570–72, 106 S. Ct. at 1346–48 (holding that the presence of four *uniformed* state troopers in the front row of the gallery was neither inherently nor actually prejudicial to the defendant). Further, the district court instructed that the jurors not pass through the door with the additional metal detector in entering the courtroom. Significantly, the record lacks any evidence that the jurors were aware that the spectators were subject to this screening, or, even if they were, that they would have known that the second metal detector was

anything out of the ordinary.  *See United States v. Howell*, 514 F.2d 710, 715 (5th Cir. 1975) (no prejudice where all persons entering courtroom, *including jurors*, were required to pass through two metal detectors).

The Appellants thus fall short of demonstrating that the additional law enforcement personnel and metal detector posed any risk that an impermissible factor would affect the jury's decision-making process, or that these measures actually prejudiced that process in any way.  And, even if we were able to discern some degree of prejudice attributable to these practices, the Appellants' claims of being denied a fair trial on these grounds would nevertheless fail based on the existence of an essential state interest, as discussed *supra*, that provided sufficient cause for this level of security.

## B.  Gang Expert Testimony

Wilson and Daniels also contend that the district court erred in denying their motions in limine and allowing Detective Caffey, who has specific and personal knowledge of California gangs, to testify as an expert about Montgomery, Alabama gang activity and his opinion of the Appellants' conduct during the home invasion in this case.  Specifically, the Appellants challenge the reliability of Detective Caffey's opinion on the grounds that he failed to explain how his experience led to the conclusions reached, and how he reliably applied that experience to the facts of this case.  The Appellants also argue that Detective

Caffey's testimony was irrelevant to the allegations in the indictment, highly prejudicial to the Appellants, and misleading and confusing to the jury.

The admissibility of expert testimony is governed by Federal Rule of Evidence 702. Fed. R. Evid. 702. That rule requires a district court to engage in a three-prong inquiry, considering whether

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Frazier*, 387 F.3d at 1260 (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 561 (11th Cir. 1998)). The proponent of the expert opinion bears the burden of establishing qualification, reliability, and helpfulness by a preponderance of the evidence. *Id.* (quoting *McCorvey*, 298 F.3d at 1257); *see also Daubert*, 509 U.S. at 592 n.10, 113 S. Ct. at 2796.

The Supreme Court has identified certain factors that may be probative in assessing the reliability of an expert's methodology under the second prong: "(1) whether it can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) what its known or potential rate of error is, and whether standards controlling its operation exist; and (4) whether it is generally accepted in the field." *Brown*, 415 F.3d at 1267 (citing *Daubert*, 509 U.S. at 593–94, 113 S.

36

Ct. at 2796–97).  However, the Supreme Court has emphasized that the *Daubert* factors "do not constitute a definitive checklist or test."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150, 119 S. Ct. 1167, 1175, 143 L.Ed.2d 238 (1999) (emphasis omitted) (internal quotation marks omitted) (citing *Daubert*, 509 U.S. at 593, 113 S. Ct. at 2796).

Rather, because the inquiry under Rule 702 must be tied to the particular facts of the case, the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony."  *Id.* (citations omitted) (citing *Daubert*, 509 U.S. at 591, 113 S. Ct. at 2796).  As such, a district court maintains "the same kind of latitude in deciding how to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides whether or not that expert's relevant testimony is reliable."  *Id.* at 152, 119 S. Ct. at 1176 (emphasis omitted) (internal quotation marks omitted) (citing *Daubert*, 509 U.S. at 593, 113 S. Ct. at 2796).

Some of the *Daubert* factors may help to evaluate the reliability of expert testimony, like that of Detective Caffey, that is based on experience, if those factors are "reasonable measures of the reliability" of the testimony in the case.  *Id.* at 150–51, 119 S. Ct. at 1176.  In other cases, different questions may be more useful, such as "how often an . . . expert's experience-based methodology has

37

produced erroneous results," "whether such a method is generally accepted in the relevant . . . community," or "whether his preparation is of a kind that others in the field would recognize as acceptable." *Frazier*, 387 F.3d at 1262 (quoting *Kumho Tire Co.*, 526 U.S. at 151, 119 S. Ct. at 1176).  A district court, in some circumstances, "may determine the reliability prong under *Daubert* based primarily upon an expert's experience and general knowledge in the field."  *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1336 (11th Cir. 2010).  But if the witness relies solely or primarily on experience as the basis of his expertise, he must explain "how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Frazier*, 387 F.3d at 1261 (emphasis omitted) (citing Fed. R. Evid. 702 advisory committee's note to 2000 amendment).

Notwithstanding the apparent relevance and reliability of proffered expert testimony under Rule 702, the testimony may be excluded from evidence by application of Federal Rule of Evidence 403.  According to Rule 403, a district court may exclude otherwise admissible evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  Of particular concern with regard to Rule 403 is the "powerful and potentially misleading effect

38

of expert evidence." *Frazier*, 387 F.3d at 1263 (citing *Daubert*, 509 U.S. at 595, 113 S. Ct. at 2798) ("Simply put, expert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse.").

Contrary to Wilson's and Daniels' assertions, Detective Caffey was qualified to testify as a gang expert in this case, satisfying the first requirement of Rule 702. *See id.* at 1261 ("[E]xpert status may be based on 'knowledge, skill, *experience*, training, or education." (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment)). Detective Caffey's experience included thirty years with the LAPD specializing in street gangs, during which time he participated in extensive investigation and interviewing of thousands of Blood gang members on both the west and east coasts, often for the purpose of identifying gang membership. He also served as a nationwide consultant, speaker, and instructor on the origins, customs, and practices of the Bloods, and appeared in a documentary on Bloods and Crips televised to a national audience.

While the Appellants emphasize that Detective Caffey never testified to having worked specifically with Montgomery, Alabama gang members or the Appellants in this case, Detective Caffey's expertise, for the purposes of this trial, "did not need to extend to every detail and intricacy particular to [the] personal

39

history and organization" of the Blood gang at this specific location. *See Augustin*, 661 F.3d at 1125 (affirming the district court's finding that the proffered expert was qualified to testify as to the organization, history, and symbols of a specific Chicago, Illinois, gang based on his fifteen years of experience working with Chicago street gangs, investigating and interviewing gang members, serving as a consultant in over fifty gang investigations nationwide, and contributing to a documentary series on street gangs). Nor did Detective Caffey need to go so far as to interview the Appellants in order to offer expert opinion on the evidence in this case. *See Kumho Tire Co.*, 526 U.S. at 148, 119 S. Ct. at 1174 ("[E]xperts may testify to opinions, including those that are not based on firsthand knowledge or observation." (citing *Daubert*, 509 U.S. at 592, 113 S. Ct. at 2786)). Rather, because Detective Caffey's expertise included knowledge of not only the origin and customs of the Blood gang in California, but also the general trends and distinctions among Blood gang members throughout the country, including those in Montgomery, Alabama, he was qualified to testify regarding these matters.

The second requirement, the reliability of the expert's methodology, was also established by Detective Caffey's testimony. Detective Caffey recited his extensive experience identifying Blood gang members through investigative and interview techniques, and laid out the various identifiers of Blood gang membership nationwide. Those identifiers included, among others, the color red,

Philadelphia Phillies paraphernalia, clothing displaying a "B" or "P," hand signs, the use of the word "Piru," the carrying of firearms, and criminal activity. He stated that he had reviewed certain evidence in this case, such as transcripts, recordings, and photographs, and, when asked to comment on that evidence, noted, on the record, several gang identifiers present therein and reiterated the significance or meaning behind each.

When questioned about the statements of one of the victims of the home invasion, Detective Caffey drew focus to the victim's statements that the perpetrators wore red hats, one bearing the Philadelphia Phillies "P," and shouted the word "Piru" repeatedly. Based on those facts, Detective Caffey opined that the conduct of the perpetrators of the home invasion—namely, "being in a house while committing a crime, shouting the term 'Piru'"—was consistent with the activity that he had observed, in his experience, among Blood gang members. Detective Caffey further offered his opinion that the Philadelphia Phillies hat likewise was indicative of Blood gang membership.

From this testimony, the district court could reasonably infer that Detective Caffey reached his opinions on the facts of this case, including his opinion regarding the Appellants' conduct during the home invasion, by relying on his experience investigating individuals for certain gang identifiers, looking for those identifiers in the evidence provided to him, and drawing general conclusions about

41

the nature of that evidence based on the presence of those identifiers. Further, Detective Caffey's years of experience applying this methodology to resolve identification issues sufficiently supported the reliability of his application to the facts in this case, and his express observations and reasoning on the record reinforce this conclusion.

Interestingly enough, the reliability of Detective Caffey's methodology finds further support in the fact that Pierce's own expert, Taylor-Austin, relied on similar experience-based credentials and the same gang-membership identifiers in assessing the conduct of the Appellants. Indeed, Taylor-Austin confirmed that clothing in a specific color, Philadelphia Phillies memorabilia, and terminology such as "Piru" were factors suggestive of Blood gang membership, and reached a conclusion regarding the evidence in this case based, in part, on these facts. *See id.* at 151, 119 S. Ct. at 1176 (recognizing that it may be appropriate to ask an expert relying on experience "whether his preparation is of a kind that others in the field would recognize as acceptable," and "whether [his] . . . method is generally accepted in the relevant . . . community").

The only cognizable difference between the opinions of Detective Caffey and Taylor-Austin was not whether the evidence contained indicators of Blood gang membership, but rather whether those indicators pointed to membership solely in the Blood gang or in a hybrid gang having features of both the Bloods and

other gangs.  However, that Detective Caffey and Taylor-Austin arrived at different conclusions in applying similar methodologies—while perhaps relevant to the weight accorded to their opinions—in no way undermined the reliability of Detective Caffey's methodology, or the admissibility of this evidence, at the outset.  *Cf. id.* at 153, 119 S. Ct. at 1177 ("[A]fter considering respondents' defense of [the expert's] methodology, the District Court determined that [his] testimony was not reliable.  It fell outside the range where experts might reasonably differ, and where the jury must decide among the conflicting views of different experts, even though the evidence is 'shaky.'" (citing *Daubert*, 509 U.S. at 596, 113 S. Ct. at 1786)).

Turning to the third and final requirement of Rule 702, Detective Caffey's testimony was likely to assist the jury in understanding the evidence introduced at trial.[13]  When Detective Caffey took the stand, the jury had already heard from other witnesses, including the Appellants' coconspirators and the victims of the home invasion, who testified to many unique traits of the Appellants.  For example, the Appellants' coconspirators had testified, in part, that Wilson and Daniels were Blood gang members with either "OG," "double OG," or "triple OG" status; wore red; carried firearms every day; used the term "Piru" frequently; and

---

[13]  Although Wilson and Daniels do not frame their arguments in terms of "helpfulness to the jury," the Court, in an abundance of caution, addresses this requirement here, given the Appellants' objections to the admission of Detective Caffey's testimony under Rule 702 generally, as well as their concerns about the testimony's potential effect on the jury.

43

replaced the letter "C" with "B" when communicating with other gang members.[14] Likewise, the victims of the home invasion had described their perpetrators as wearing red hats, one containing the Philadelphia Phillies' "P," and tennis shoes with red shoe laces; carrying firearms; and shouting the word "Piru" multiple times. Other evidence presented to the jury had included photographs and recordings of telephone conversations, in which the Appellants exhibited these same mannerisms.

Interwoven throughout these items of evidence were details that, without more, may have appeared meaningless, extraneous, or even confusing to the jurors. Detective Caffey's testimony, however, served to put these facts into context, helping the jury to understand not only the meaning but also the import of this evidence in evaluating the alleged gang activity underpinning the conspiracy charge. Thus, Detective Caffey's own testimony provided ample support for the qualification, reliability, and helpfulness requirements, such that the district court did not err in finding this testimony relevant and admissible under Rule 702.

Nor did the district court abuse its discretion in admitting Detective Caffey's testimony over the Appellants' objections under Rule 403. Detective Caffey's testimony regarding the Blood street gang—in particular, his opinion that the Appellants' conduct was consistent with that of Blood gang members—was highly

---

[14] Anthony Tallie testified that Daniels was a "triple OG," and Wilson an "OG" or "double OG," while Willie Tallie represented that both held the "OG" rank.

44

probative of the conspiracy charge in Count One of the indictment.  The essence of the conspiracy charge was that the Appellants were all members of the same street gang, and, as such, evidence of the Appellants' membership in or affiliation with the Blood gang tended to make the prosecution's theory of the case more likely. *See United States v. Ross*, 33 F.3d 1507, 1525 & n.31 (11th Cir. 1994) (uncharged acts of gang violence admissible as intertwined with, and probative of, conspiracy charge); *United States v. Harrell*, 737 F.2d 971, 978 (11th Cir. 1984) (gang evidence important in understanding existence, motives, and object of drug-trafficking conspiracy and means through which it was conducted); *see also United States v. Archuleta*, 737 F.3d 1287, 1294 (10th Cir. 2013) (stating that gang-affiliation testimony is admissible in cases where conspiracy is charged "to prove the existence of a conspiracy and to show the basis of the relationship between the defendant[s] and witnesses who participated" in the wrongful activity).

Moreover, of the gang evidence adduced at trial, Detective Caffey's testimony was particularly probative of the conspiracy charge, because it served to clarify certain ambiguities and fill in the gaps left by the other gang evidence. *See United States v. Bradberry*, 466 F.3d 1249, 1253–54 (11th Cir. 2006) (evidence of defendant's gang membership was probative, because it helped explain his connection to other individuals and circumstances in which they committed charged offense); *Jernigan*, 341 F.3d at 1284 (evidence of defendant's membership

45

in gang that used color red as symbol and wrapped weapons in red bandanas was "especially probative" in light of evidence that defendant's weapon was found wrapped in red bandana); *see also Augustin*, 661 F.3d at 1126 (gang evidence became relevant upon admission of recordings of defendant discussing such gang and likening himself to its leader).

It is not lost on the Court that evidence of a defendant's gang membership necessarily carries a potential for unfair prejudice. *See Bradberry*, 466 F.3d at 1253 (citing *Jernigan*, 341 F.3d at 1284–85); *Jernigan*, 341 F.3d at 1284–85 ("Indeed, modern American street gangs are popularly associated with a wealth of criminal behavior and social ills, and an individual's membership in such an organization is likely to provoke strong antipathy in a jury."). However, most evidence is prejudicial to one party in one way or another, and nothing in this case suggests that Detective Caffey's testimony was assigned undue weight by the jury, or otherwise prejudiced the Appellants in a way that was anything other than what could be expected of evidence offered against a party. *See Augustin*, 661 F.3d at 1126 (gang evidence not unfairly prejudicial); *Bradberry*, 466 F.3d at 1253–54 (same). Nor is there any evidence that Detective Caffey's testimony misled the jury or caused confusion of the issues. To the contrary, and for the reasons discussed with regard to its helpfulness, his testimony could have served only to

46

clarify the gang references, symbols, and terminology present in the testimony and other evidence that had come before it.

At most, the Appellants make an argument that Detective Caffey's testimony presented a close question under Rule 403. In such circumstances, the decision of whether to admit the evidence falls "squarely within the ambit of the district court's sound discretion," and we are ill positioned to disturb the district court's ruling on appeal. *Bradberry*, 466 F.3d at 1254 (quoting *Jernigan*, 341 F.3d at 1285); *Jernigan*, 341 F.3d at 1285 ("[T]he district court is uniquely situated to make nuanced judgments on questions that require the careful balancing of fact-specific concepts like probativeness and prejudice." (citing *United States v. Williams*, 216 F.3d 611, 615 (7th Cir. 2000))). We therefore cannot say that the district court abused its discretion in allowing Detective Caffey to testify as an expert at trial.

## IV.  CONCLUSION

In light of the foregoing, we find no reversible error in the enhanced security measures and the gang-expert testimony at trial. Accordingly, we **AFFIRM** the Appellants' convictions and sentences in all respects.